## ROBSON v. MISSISSIPPI RIVER LOGGING CO.

### (Circuit Court, N. D. Iowa, E. D. April 2, 1894.)

1. CONTRACTS—MUTUALITY—SUBJECT MATTER—PERFORMANCE.

   A contract between plaintiff and defendant recited that plaintiff owned timber lands tributary to two streams on which defendant was engaged in the business of driving logs, and that differences had arisen between the parties in regard to charges for services rendered by defendant; it was therefore agreed that, in consideration of a specified compensation, defendant should drive, boom, and deliver all logs put by plaintiff in the rivers in question, not to exceed a named limit annually. The parties acted under this contract until all but a small part of the timber was cut from plaintiff's land. *Held,* that defendant could not refuse performance as to the balance of the timber on the ground that there was a lack of mutuality in the contract.

2. SAME—EXCUSE FOR NONPERFORMANCE—IMPOSSIBILITY.

   Plaintiff owned timber lands on the Chippewa river, and a sawmill below, on the Mississippi. Defendant logging company contracted to receive the logs, and deliver them at plaintiff's mill. To do this it was necessary to drive them down the Chippewa into a boom where they were assorted by means of pockets and formed into rafts so as to be towed by the raft boats in use on the Mississippi. The contract bound defendant, in terms, to perform these several operations, and specified "Beef Slough" boom, which was controlled by defendant, as the one into which the logs were to be driven. During the life of the contract Beef slough was filled up by the action of floods, and was no longer available for use as a boom; but defendant constructed a boom in another slough, on the west bank of the Mississippi, and the operations necessary to the delivery of plaintiff's logs could be carried on as well at this boom as at Beef slough. *Held,* that defendant could not excuse itself from further performance of the contract on the ground that it had been rendered impossible by natural causes which it could not control.

3. SAME—NONPERFORMANCE—EXCUSES.

   Defendant contracted to drive, boom, raft, and deliver plaintiff's logs, and agreed that the boom charges should not exceed 60 cents per thousand feet. During the life of the contract the necessary boom charges were increased by reason of circumstances over which neither plaintiff nor defendant had any control. *Held,* that this did not excuse defendant from further performance of the contract, nor entitle it to demand a higher compensation than that contracted for.

4. BEST AND SECONDARY EVIDENCE—SCALE BOOKS—LOGGING.

   "Scale books" were offered in evidence to show the quantity of timber cut from certain lands. It was shown that "camp scalers" take the measurements of logs as they are cut in the woods, and enter them upon cards; that at the close of the day these measurements are entered on the scale books; that inspectors verify the scale books by counting the logs and remeasuring a sufficient number to satisfy themselves of their correctness; and that the scale books are then sent to the owners of the logs, and payment made to the cutter according to their contents. *Held,* that the scale books are primary evidence of the quantity of logs cut.

This was an action by John Robson against the Mississippi River Logging Company, for breach of contract concerning the driving and delivering of logs upon the Chippewa river. The case was submitted to the court upon the law and evidence, a jury being waived.

The finding of facts:

(1) I find that at the date of the bringing of this action the plaintiff, John Robson, was a citizen of the state of Minnesota, and the defendant company was a corporation created under the laws of the state of Iowa.

(2) I find that for a number of years prior to 1882 the defendant company

was engaged in the business of running and driving logs and timber down the Flambeau and Chippewa rivers, in the state of Wisconsin, to the Mississippi river; including in such business, logs and timber owned by the defendant, and logs and timber owned by third parties.

(3) I find that prior to 1882 the general mode in which the said business was carried on was as follows: The logs and timber were placed by the owners thereof on the banks or in the water of the said Flambeau and Chippewa rivers, and the tributaries thereof. The driving of the logs down the river was performed by the defendant corporation, or by the Chippewa Lumber & Boom Company, which latter company was under the control and management of the defendant. When the logs reached Beef Slough boom, which was situated on the lower part of the Chippewa river, they were taken possession of by the Beef Slough Boom Company, and were run into the boom managed by said company; and the logs belonging to the different owners were separated from the common mass, and run into pockets. Having been then assorted, they were then brailed, and formed into rafts, in proper condition to be taken in tow by the raft boats which conveyed them to their several points of destination upon the Mississippi river.

(4) I find that for a number of years prior to the year 1882 the plaintiff, John Robson, had been engaged in the lumber business, upon the Mississippi river; that he had a sawmill at Lansing, upon that river, and that he brought the logs sawed at the mill from the lands tributary to the Flambeau and Chippewa rivers in Wisconsin; that he owned a quantity of timber lands tributary to these streams, from which he annually cut a number of logs, and that he also bought logs from other persons, or bought the right to cut logs from lands owned by other persons, and tributary to the streams above named; that for a number of years prior to 1882 all the logs cut or bought by the plaintiff in the regions tributary to the Flambeau and Chippewa rivers were driven for him by the defendant company, or by the Chippewa Lumber & Boom Company.

(5) I find that certain differences and disputes in regard to the handling of said logs, and the prices to be paid therefor by plaintiff, having arisen thereupon, on the 23d day of August, 1882, the plaintiff and defendant entered into a contract in writing, of the following term and effect:

"Articles of agreement made and entered into this 23rd day of August, 1882, by and between the Mississippi River Logging Company, a corporation organized under the laws of Iowa, party of the first part, and John Robson, party of the second part, witnesseth: Whereas, the party of the second part owns a large quantity of pine lands tributary to the Chippewa and Flambeau rivers and their branches in Wisconsin, and now has a large quantity of sawlogs and timber in said streams, and expects to cut annually hereafter and deliver in said streams, a large quantity of sawlogs and timber, to be driven to market, down said streams, to the Mississippi river; and whereas, the said party of the first part is engaged in the business of driving logs down said streams, to Beef slough, for other parties; and whereas, differences having arisen between said parties hereto, and between the party of the second part and the Chippewa Lumber & Boom Company (which is controlled by the party of the first part), in respect to the running and driving of logs: Now, therefore, for the purpose of settling all said differences, and providing for the future, it is mutually agreed as follows: First. Said party of the first part, in consideration of the premises, and of the promises of the said party of the second part hereinafter mentioned, agrees to take possession and control of all logs and timber which the party of the second part shall deliver in said Chippewa river, below east and west forks thereof, and all that shall be delivered in said Flambeau river, at or below the north and south forks of said streams, and to drive the same, at its own cost, charges, and expense, down said streams, to and into Beef Slough boom, not exceeding an average of twenty-five millions of feet annually, said logs to be driven each season with all reasonable dispatch, and with as much care and facility as it shall drive its own logs. The logs of the party of the second part now in said streams are to be driven by said first party under this agreement. Any charges to be paid the Chippewa Lumber and Boom Company, or any other company, person, or persons, on account of said logs, or any of the same, between the aforesaid forks of said streams and said

Beef Slough boom are to be paid by said party of the first part. Second. And the said party of the first part, in consideration of the premises, further undertakes and agrees that the charges of the said Beef Slough Boom Company shall not exceed sixty cents per thousand feet for booming, assorting, and delivering in pockets, and watching the said logs of the said party of the second part at all the mills on the Chippewa river. Third. And the party of the first part, in consideration of the premises, further undertakes and agrees to brail and deliver to the said second party, in a proper and usual manner, his said logs, ready to be taken in tow by boat after the same are turned out into pockets, by said Beef Slough Boom Company, and to do the same with all reasonable dispatch. Fourth. And the said party of the second part, in consideration of the premises, promises and agrees to pay to the said first party, annually, at the close of each season's business, for taking the care, control, and delivering said logs into Beef Slough boom, as agreed as aforesaid, the sum of two hundred and fifty dollars, and for brailing and delivering said logs, ready for the towboat, twenty-five cents per thousand feet. And said party of the second part also further agrees to return to the said party of the first part the brailing lines used in brailing said logs, unless the same shall have been three times used. Fifth. In case the said party of the second part associates any person or persons with him, as partner or partners, in such lumbering business, this agreement is to stand, apply, and operate in respect to such partnership. But no logs are to be handled by said party of the first part, under this agreement, except such as shall be owned by said party of the second part, or by him and others as partners. The cost of scaling the said logs as the same are turned into said Beef Slough boom is to be paid equally by the parties hereto. Witness our hands and seals this 23rd day of August, 1882.                 Mississippi River Logging Co.
                                      "F. Weyerhauser, Pt.
                          "John Robson."

(6) I find that after the date of the contract, and up to April 4, 1889, both parties recognized their contract to be in full force, and the defendant company took charge of and handled all logs delivered to it by plaintiff in accordance with its provisions.

(7) I find that on April 4, 1889, the defendant company notified the plaintiff, by a letter addressed to him, and received in due course of mail, that it would no longer be bound by said contract, the said letter reading as follows:

"Chippewa Falls, Wis., April 4th, 1889.

"Mr. John Robson, Winona, Minn.—Dear Sir:  You will please to take notice that the Mississippi River Logging Company elects to, and does hereby, terminate the contract made with you for driving your logs on the Chippewa and Flambeau rivers, in the state of Wisconsin, and for fitting said logs at Beef slough for transportation down the Mississippi, being the contract bearing date August 23rd, 1882, all the provision of which are hereby terminated, and will not be hereafter considered binding between the parties. If you do not receive your logs at Beef slough when delivered in the pockets, and fit them for transportation, it will be taken for granted that you elect to have this company act for you in that regard, charging therefor same as for like services done for others.
        "Yours, respectfully,                 Mississippi River Logging Co.,
                                      "By F. Weyerhauser, Prest."

(8) I find that since said 4th day of April, 1889, and as a consequence of the refusal of the defendant company to further handle, drive, or care for the logs owned by plaintiff for the prices named in the contract, the plaintiff has been compelled to pay larger sums for the performance of the work necessary therefor; such additional payments amounting to 38½ cents per 1,000 feet, subject to reduction of $250 per year, the contract price for driving. And I further find that plaintiff paid the sum of $350.27 as an extra charge for brailing in 1889, in addition to the total of 38½ cents increase.

(9) I further find that at the date of the contract in question, to wit, August 23, 1882, the plaintiff had upon the banks or in the waters of the Flam-

beau and Chippewa rivers, below the forks thereof, logs and timber to the amount of 14,901,430 feet, according to bank scale.

(10) I find that since the said 23d day of August, 1882, the plaintiff has cut from the lands by him owned at the date of the contract, and placed in the waters of the Chippewa and Flambeau rivers, as provided in said contract, timber to the amount of 97,848,024 feet at bank scale, and that there was in April, 1889, standing uncut upon said lands, the further amount of 3,869,-000 feet of pine timber, at bank scale, and 724,000 feet of hemlock timber.

(11) I find that since the date of said contract the plaintiff has placed in the waters of said Chippewa and Flambeau rivers, 36,190,366 feet of logs cut from lands other than those owned by plaintiff at the date of the contract, and that the defendant has driven, cared for, and delivered those logs to plaintiff, receiving pay therefor at the contract prices.

(12) I find that the evidence fails to show that in so handling the timber, described in the last finding, the defendant was misled in regard to the source whence this timber was procured, or that it acted under any mistake of fact.

(13) I find that in 1884 an extraordinary flood occurred in the Chippewa river, which brought about a change in the channel of the river near the entrance to Beef slough, and resulted in the filling up thereof. The defendant company made all reasonable efforts and expenditures to keep open said slough, and the entrance thereto, but without avail; and finally, in 1889, Beef slough was wholly abandoned, and since then it has not been used in connection with the logging business on the Chippewa river.

(14) I find that when it became apparent that Beef slough was becoming unfit for booming purposes a company was organized, under the laws of the state of Minnesota, for the purpose of creating and managing a boom at West Newton slough, on the west bank of the Mississippi river, and booming facilities costing in excess of $100,000 were then created; and the logs coming down the Chippewa river have since then been run into, and handled in West Newton slough, instead of Beef slough.

(15) I find that the relations existing between the West Newton Boom Company and the defendant company are substantially the same as those existing between the defendant company and the Beef Slough Company.

(16) I find that by the use of the facilities created at West Newton slough the logs driven down the Chippewa river can be boomed, brailed, formed into rafts, and be delivered to towboats for transportation down the Mississippi river, but the expense thereof is somewhat in excess of what the same work cost at Beef slough.

(17) I find that the defendant failed to handle, as it was required to do under the contract, the sum of 42,238,799 feet of pine timber, and that the additional cost for handling the same, which plaintiff has been compelled to pay, or will be compelled to pay, equals the sum of $15,611 over and above the cost at contract rates.

J. A. Tawney and Henderson, Hurd, Daniels & Kiesel, for plaintiff.
J. J. Jenkins and H. H. Hayden, for defendant.

SHIRAS, District Judge. Upon the final argument of this case, it was urged by counsel for defendant that the facts developed in the evidence are such as to show that the contract, when applied to its subject-matter, must be held to be one terminable at the option of the defendant. I do not think the evidence presents the question in any aspect other or different from the one considered when the case was submitted on demurrer, and when it was held that the contract was not one terminable at will. See opinion, 43 Fed. 364. I adhere, therefore, to the views therein expressed upon this question.

It is further contended that the contract does not, in terms, bind the plaintiff to cut or deliver any timber, and that, therefore, the

defendant is not to be held bound by the contract, for want of mutuality. There are cases wherein, by the terms of the contract, only one party is bound to do any act or anything in the nature of performance; and in this class of cases, so long as the contract remains executory, and in the absence of any recognized consideration, it is held that they cannot be enforced, for want of mutuality. The case at bar does not fall within this rule. In substance, the contract was to the effect that if the plaintiff would, within a reasonable time, cut and deliver in the Chippewa river and Flambeau river the timber standing upon the lands owned by plaintiff at the date of the contract, and tributary to the named rivers and their branches, the defendant company would receive, care for, drive, and deliver the same, as provided in the contract, for the compensation therein named. The evidence shows that ever since the date of the contract the plaintiff has been cutting the timber upon the lands referred to in the contract, placing the same in the waters of the Chippewa and Flambeau rivers, and has in fact so cut and placed much the greater part of the timber on said lands. For some seven years and more the defendant received the timber thus cut, handling the same according to the terms of the contract, and received the compensation stipulated to be paid for the services rendered. From and after April 4, 1889, the defendant refused to further receive or handle the remaining portion of the timber under the terms of the contract, although the plaintiff continued to cut and place the same in the waters named in the contract. Thus it appears that performance of the contract was entered into by both of the parties thereto. The larger part of the timber has been cut, received, and delivered, and the defendant has received the benefits of the contract in regard thereto. It will not do to now claim that the contract can be avoided, in regard to the small portion of timber not yet cut, on the ground that the contract is simply executory, or that there is a want of mutuality therein. As to the timber heretofore cut and placed in the waters of the Chippewa and Flambeau rivers, the defendant company, by taking possession thereof, and driving and delivering the same, became entitled to demand, and could enforce, payment from the plaintiff of the sums he agreed to pay for the services rendered. It must be kept in mind that this contract was not to the effect that the defendant company would drive and care for all lumber delivered to it, year by year, by plaintiff. The subject-matter of the contract was the timber standing upon the lands owned by plaintiff upon the Chippewa and Flambeau rivers, and the logs in the streams at the date of the contract. What the parties bargained about was the handling of this timber, and the price to be paid therefor; and, the contract having been made, both parties entered upon the performance thereof. The plaintiff commenced cutting and delivering the timber, and paid, from time to time, the contract price for the portions received, handled, and delivered by the defendant; and the latter received, handled, and delivered the timber, without objection, up to April 4, 1889. At that date the contract was not wholly executory, but, on the contrary, it had been partly and largely

performed by both parties. It was then, in fact, in process of performance by both parties, and each had reaped a benefit therefrom. Under such circumstances, it was not open to the defendant to cease performance on its part on the ground that when the contract was signed there was a want of mutuality, because the plaintiff was not bound to cut any of the timber standing upon his land. Even if it be admitted that under this contract there was no obligation binding the plaintiff to cut the timber on his land, and to deliver it to the defendant, for the purpose of the contract, yet it is clear that both parties assumed that the timber would be cut, and the evidence shows that the plaintiff has in fact performed, in this particular, all that the defendant could reasonably demand, and the latter, for years, accepted the timber cut, and handled the same, under the provisions of the contract; and thus the contract went into full force, and became binding upon the parties thereto. Thus, in Storm v. U. S., 94 U. S. 76, wherein was involved the question of the liability of a contractor and his sureties for the nonperformance of a contract to furnish certain supplies, it was objected that the contract was not mutually binding, was therefore without consideration, and hence was void. The court overruled the objection, saying that:

"Beyond doubt, the written agreement went into operation, and it is not even suggested that the department and division commanders ever expressed any disapproval of its terms or conditions. * * * Suppose it to be true that the quartermaster general might terminate it, if he should see fit. It is a sufficient answer to the suggestion to say that he never did interfere in the matter, and that the contract continued in full force and operation throughout the whole period 'for which the necessary supplies were purchased by the United States in open market. Where the defendant has actually received the consideration of a written agreement, it is no answer to an action brought against him for a breach of his covenants in the same to say that the agreement did not bind the plaintiff to perform the promises on his part therein contained, provided it appears that the promises in question have in fact been performed, in good faith, and without prejudice to the defendant. Add. Cont. (6th Ed.) 15; Morton v. Burn, 7 Adol. & E. 25. Agreements are frequently made which are not, in a certain sense, binding on both sides at the time when executed, and in which the whole duty to be performed rests primarily with one of the contracting parties. * * * Cases often arise where the agreement consists of mutual promises, the one promise being the consideration for the other; and it has never been seriously questioned that such an agreement is valid, and that the parties are bound to fulfill their respective obligations."

In the case now before the court, it may be true that the defendant company could not perform its agreement to drive and deliver the logs unless they were cut and placed in the streams by the plaintiff, and that the contract, in terms, does not bind the plaintiff to cut any logs whatever; but this only shows that in that particular the agreement of the defendant was dependent upon the prior action of the plaintiff, and it has never been held that because the covenant or agreement of the one party cannot be performed until the other has taken the necessary action, therefore the contract is not enforceable. The contract in question expressly recites, and the evidence shows, that when the contract was entered into the plaintiff then had in the waters of the Chippewa and Flambeau rivers a large quantity of logs, already cut, and ready for driving. In regard to these

logs the plaintiff was not required to do anything further, in order to bring them within the purview of the contract; but the defendant company was expressly bound to take possession of and care for these logs, and the plaintiff was bound to pay the stipulated price therefor. Furthermore, as the plaintiff, from time to time, cut and placed in the rivers named in the contract other logs from the lands included in the contract, the obligation rested upon the defendant company to care for the same as in the contract provided, and in consideration therefor the plaintiff became bound to pay the stipulated sums for such services. Moreover, it is stated in the contract that differences had arisen between the parties in interest in regard to the running and driving logs, and the evidence shows that a suit was pending in regard thereto. These differences, and the litigation based thereon, were settled, as part of the contract entered into by the parties, and, of itself, this constituted a recognized, valid consideration, sufficient to support the contract; and, that being supported by a sufficient consideration, then the obligation of the defendant company to receive, drive, care for, and deliver the logs became performable as the logs were cut and placed in the waters of the Chippewa and Flambeau rivers, and the refusal of the defendant company in April, 1889, to further receive and drive logs cut from the lands included in the contract cannot be justified on the ground of want of consideration, or of lack of mutuality.

Objection is also made to the enforceability of the contract on the ground that there is no time fixed within which the plaintiff can be required to cut the logs upon his lands, and that the defendant company might, therefore, be required to be prepared, at large expense, to drive and care for the logs for an unlimited time in the future. When the time of performance is not fixed, in express terms, in a contract, the rule is that it must be had within a reasonable time; and, in determining what is a reasonable time, regard is had to the situation of both parties. In legal effect, the contract between the parties requires of the plaintiff that he shall cut all the timber he intends to have driven under this contract within a reasonable time. If the plaintiff should delay the cutting of any portion of the timber for an unreasonable time, it would be held that thereby he had lost the right to demand performance on part of the defendant. It is not claimed that in fact there has been any delay in this particular on part of the plaintiff. When the defendant sought to terminate the contract, in the spring of 1889, it was then engaged in driving logs down the Chippewa river, and it still continues in the same employment. There is no force, therefore, in the suggestion that a heavy burden might be placed upon the defendant if the contract is held enforceable, by reason of the fact that no time is named for its final completion, because the plaintiff can claim only a reasonable time in which to cut the timber in question, and it is not claimed that the plaintiff has not exercised due diligence in this particular.

On behalf of the defendant, it is further claimed that, granting that the contract was originally valid and enforceable, nevertheless, by reason of the effect of the high water occurring in 1884 in the

Chippewa river, the entrance to Beef slough became filled up with sand, and it became impracticable to continue the use of the slough for booming purposes, and thereby the contract was rendered substantially impossible of fulfillment, and as this impossibility of fulfillment is due to the operations of nature, beyond the control of the defendant, it excuses the defendant from further performance. Counsel for the defendant cite in their brief many cases wherein exceptions are recognized to the doctrine formerly held, that, where the duty or obligation sought to be enforced was imposed by law, then impossibility of performance was a good defense, but that, where the duty was one created by the contract of the parties, then impossibility of performance was not an excuse for nonperformance, unless it was so provided in the contract. The general rule now prevailing is that stated by the supreme court in Railway Co. v. Hoyt, 149 U. S. 1–14, 13 Sup. Ct. 779, wherein it is said:

"There can be no question that a party may, by an absolute contract, bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance; and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But, where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of, the particular contingency which afterwards happened."

Assuming for the moment that the filling up of the entrance to Beef slough rendered the contract impossible of fulfillment, can it be said that the possibility thereof was not within the knowledge of the parties? Is it not a fact known to all persons engaged in business upon the Mississippi river and its tributaries, like the Chippewa, that changes in the channel are constantly taking place; that sandbars are created in some places, and are washed away in others; and that there is not only a possibility, but a probability, that, in the course of years, deflections in the current will take place, of such magnitude as to open new outlets for the passage of the water, and to close those formerly existing? Can any one travel along the Mississippi or Chippewa rivers, and not see convincing evidence of the liability of these changes taking place? These changes are not alone caused by very high floods, but are also the result of the constant action of the waters in these streams. Can it, therefore, be fairly claimed that the closing up of the entrance to Beef slough was such an unlikely event that it could not have been anticipated, and have been provided for in the contract of the parties? But, however this may be, is it true, in fact, that the closing of the entrance to Beef slough prevented a fulfillment of the contract on part of the defendant? The determination of this question involves the construction of the contract as a whole, which, in turn, requires the reading of the terms of the contract in the light thrown thereon by the situation and relation of the parties when the agreement was made. The recital in the contract, and the other evidence in the case, show that at the date of the contract, and prior thereto,

the defendant company was engaged in the business of driving logs down the Chippewa river, some of which were delivered to mills upon that river, but the larger part were taken to the Mississippi river, and there delivered, ready for rafting, to the owners thereof. It further appears that the defendant company, through its control over the Chippewa Lumber & Boom Company, and the Beef Slough Boom Company, had practically the control or monopoly of the business of driving, booming, and delivering logs upon the Chippewa river. It further appears that the plaintiff owned a sawmill situated at Lansing, on the Mississippi river, and had for years drawn his supply of logs from the lands tributary to the Chippewa river and its branches. These logs came, not only from land owned by him, but also from land owned by others. To get the logs thus cut upon the lands tributary to the Chippewa river down to plaintiff's mill, at Lansing, it was absolutely necessary that the same should be driven down the Chippewa, and thence be rafted down the Mississippi river to Lansing. The several steps necessary to convert the trees growing upon the lands of plaintiff and others tributary to the Chippewa river into logs, and to convey them to the mill of plaintiff, are: First, the cutting the trees into logs, and placing them in the waters of the river and its tributaries, ready for driving; second, driving the same down the Chippewa, and forming them into rafts proper to be moved down the Mississippi river; and, third, rafting them down the Mississippi. It appears from the evidence that for years prior to the date of the contract the work of driving the logs owned by plaintiff, and of forming them into rafts ready for rafting down the Mississippi, had been performed by the defendant company, and the other companies controlled by it. Differences had arisen, however, between the parties, as to the prices to be charged, and perhaps as to other matters, and litigation in regard thereto was pending. In order to settle these past differences, terminate the litigation, and to provide for the future, the parties entered into this contract of August 23, 1882. It is clear that the purpose of the plaintiff was to contract for the driving of his logs, for the placing the same into rafts, and the delivery to him of the logs, ready for rafting, upon the waters of the Mississippi. This included the driving the logs down the Chippewa, the gathering them together by the agency of booms and pockets, the construction into rafts, and the delivery to plaintiff in proper form to be taken in tow by the raftboats in use upon the Mississippi river. The defendant company, on its part, agreed to take possession of the logs, when delivered in the waters of the Chippewa and Flambeau rivers, and to brail the same, and deliver them in the form of rafts, ready to be taken in tow by the boats used for that purpose. To accomplish the delivery of the logs in the form of rafts, the logs must be driven down the Chippewa river, be collected in booms, and, by the use of pockets, be selected from other logs, and, when selected, be brailed, and formed into rafts. It is entirely clear that it was not understood that after the logs were taken possession of by the defendant company, when placed in the waters of the named rivers, they again came into the possession or under the control of the

plaintiff until they were formed into rafts ready for the towboat. Therefore, it is apparent that it was understood that during the driving, booming, and brailing of the logs, they were under the supervision of the defendant company. It is doubtless true that the expectation of the parties was that the driving, booming, and pocketing of the logs would be done through the agency of the Chippewa Lumber & Boom Company and the Beef Slough Boom Company; but nothing in the contract contained shows that it was the intent of the parties that the work must be done by these companies, and no other, nor does the contract limit or define the boom or pockets within which the logs must be formed into rafts. There is nothing in the mere language of the contract which compels the defendant to use any particular agency in the driving, booming, pocketing, brailing, and delivering of the logs, and there is nothing in the purpose sought to be accomplished which requires such a construction to be placed on the contract. Certainly, it would not be open to the plaintiff to refuse to receive a raft composed of logs by him owned, offered for delivery by defendant on the waters of the Mississippi, simply because the logs had not been driven by the Chippewa Lumber & Boom Company, or had not been boomed and pocketed by the Beef Slough Boom Company, or had been boomed, pocketed, and brailed upon the north branch of the Chippewa river, instead of in Beef slough. The defendant company performs its contract, in substance, if it takes possession of the logs, causes them to be driven, and forms them into rafts proper for towage on the Mississippi river. The mere agencies by which the result is reached are immaterial. If the defendant company can devise a method by which it can collect the logs, and form them into rafts, at the proper place of delivery, other than by means of booms and pockets, it is at liberty so to do, without being chargeable with a breach of its contract. The substantial purpose of the contract was to provide for getting the logs of plaintiff, after they were cut and placed in the waters of the Chippewa and Flambeau rivers, down to the Mississippi river, and there forming them into rafts fitted for being transported to plaintiff's mill. This being so, is it not clear that the change in the channel of the Chippewa river, whereby Beef slough ceased to be available for booming purposes, cannot be said, in any fair sense, to have prevented the fulfillment of the defendant's contract?

The use of the slough for booming purposes was a mere means to the end proposed by the contract, and, if the end proposed can be reached by other means, it cannot be said that the fulfillment of the contract is impossible. If the result of the flood of 1884 had been such as to change the course of the Chippewa river so that it ceased to flow into the Mississippi river, or if the character of the river had been so changed that it could no longer be used for logging purposes, then we would have had a state of facts to which the rule contended for by the defendant company would be applicable. It would then be apparent that the defendant company could not receive the logs of plaintiff in the waters of the Chippewa river, and drive them to the Mississippi river, and such a change in the

actual situation might have the effect of terminating the contract. What is the actual situation in this respect? The Chippewa river continues to be an affluent of the Mississippi, and, as heretofore, the timber cut on lands adjacent thereto is driven down that stream without difficulty. The defendant company, since 1884, and at the present time, has been and is engaged in driving the logs owned by it and by others down the river to the Mississippi, and in brailing the same ready for rafting. There is no change in the work accomplished by it. There have been changes in the mere agencies employed, but not in the character nor the ultimate result of the work done. Under the terms of the contract in question, there was no obligation upon the defendant company to continue the booming, pocketing, and brailing in the appliances used for that purpose when the contract was signed. So long as it performed the work expected of it, the means employed might be changed at its own option. If Beef slough had not filled up, but a more advantageous place for booming and brailing the logs had been discovered, the plaintiff could not have insisted upon the defendant company continuing to use Beef slough, or the boom and pockets therewith connected. All he could insist upon was that the logs should be driven, brailed, and delivered to him ready for rafting down the Mississippi. Neither could plaintiff object to the defendant company aiding in organizing another company to supervise the booming of the logs, so long as the work was actually done in accordance with the requirements of the contract. The evidence shows that when the entrance to Beef slough commenced filling up, and after it had been demonstrated that it could not be reopened by any reasonable outlay, the defendant company sought another location for booming purposes. This was found in West Newton slough, upon the west bank of the Mississippi river. It does not appear that it was impossible to create a boom upon the North channel of the Chippewa river; and certainly, if a boom had been there placed, the plaintiff could not have objected to its use in the reception of his logs. The location at West Newton slough being deemed the more favorable one, it was selected, and a corporation was organized under the laws of the state of Minnesota for the purpose of preparing the boom and its appliances; and the practical results show that the boom thus located serves its purpose fully as well as the one formerly in use in Beef slough. It thus appears that by the use of the West Newton boom the defendant company can fully perform its contract with plaintiff. It can receive, drive, brail, and deliver in rafts, all the logs cut by plaintiff on lands owned by him tributary to the Chippewa river. Why should it be excused from so doing?

It is said, in argument, that the booming expense is greater at West Newton slough than it formerly was at Beef slough, and that this increased expense ought not to be put upon the defendant. It will be noticed that the charges to be paid by plaintiff for driving the logs, and for brailing and delivering them ready for rafting, are fixed absolutely in the contract, but the charge for booming is not thus fixed. It is agreed that the boom company charge

shall not exceed 60 cents per 1,000 feet; thus showing that it must have been understood that this charge was an uncertain one, and might be varied by circumstances. The defendant company agreed, in effect, that it would pay all charges in excess of 60 cents, and if the charge exceeds that amount it cannot complain. Some one must pay the amount in excess of 60 cents. Why should the burden be taken from the defendant, and be placed upon the plaintiff, when the former agreed to be responsible therefor? It is clear that when the contract was made the parties understood that the boom charges were liable to fluctuations. It was agreed that, up to 60 cents, the plaintiff would pay them. If they passed above that figure, then the defendant would become liable to plaintiff for the excess. The fact that they may exceed the limit does not create an equity or right in the defendant to be excused from paying the excess. The fact that the charge is imposed by the West Newton Boom Company, instead of the Beef Slough Company, is of no significance. The plaintiff did not transfer the work from the one company to the other. The defendant company, not the plaintiff, is responsible for the change in the company doing the work, and for the substitution of the one company for the other, and the change for which it is responsible cannot be relied upon as ground for refusing to further perform its contract. I find nothing in the changes brought about by the substitution of West Newton slough for Beef slough as the location for the boom used for brailing the logs driven down the Chippewa river, nor in the transferring of the work from the one boom company to the other, which would justify the court in holding that thereby the defendant company was relieved from further liability under the contract. The contract of the defendant has not, in any substantial particular, become incapable of performance; and the changes in the location of the boom and its appliances are only such a change in the mere means used to accomplish the purpose contracted about as must be held to have been within the fair contemplation of the parties when they entered into a contract which they knew must continue in force for a number of years. I hold, therefore, as a conclusion of law upon the facts of the case, that the defendant company had no legal right to refuse further performance of the contract in question, as it did in April, 1889, and that by so doing it became liable to respond in damages to plaintiff for the injuries thus caused him.

Before passing to a consideration of the facts bearing upon the question of the damages, there is another legal proposition presented by the counterclaim pleaded by the defendant. The evidence shows that after the signing of the contract, and up to April, 1889, the defendant company drove, and delivered to the plaintiff, a large quantity of logs cut from lands not owned by plaintiff at the date of the contract, and charged therefor, and has been paid, only the contract prices for the services thus rendered; and in the counterclaim it is pleaded that, in fraud of defendant's rights, the plaintiff caused it to receive and drive these logs in the belief that they were cut upon plaintiff's lands, and were therefore within the contract. It appears from the entire evidence that before and at

the date of the contract the defendant was engaged in running logs for the plaintiff without regard to the ownership of the land from which they were cut. After the date of the contract the plaintiff delivered all logs by him owned, to be driven the same as he had done before the date of the contract. Taking the entire evidence of the contract, it cannot be otherwise than that the defendant knew it was receiving all the logs owned by plaintiff, regardless of the lands from which they were cut. It must have known that plaintiff had been accustomed to purchase stumpage and logs from other landowners. It knew that the plaintiff was not engaged in driving and booming logs, and therefore all of his logs, no matter whence procured, must pass into its possession, and be driven by it. Without question or objection, it received all the logs belonging to plaintiff, and charged and was paid the one price therefor. When this suit was before the court upon demurrer, the defendant took the position that, so long as the contract was in force, it would be obliged to receive and care for all logs delivered by plaintiff, not exceeding the yearly limit of 25,000,000 feet, so long as plaintiff could procure logs from any sources that were tributary to the Chippewa and Flambeau rivers. There is nothing in the evidence tending to show that the plaintiff ever represented or stated that the logs placed in the waters of the named rivers were cut only upon lands owned by the plaintiff at the date of the contract. The logs placed in the rivers were all taken possession of by the defendant company; were driven, brailed, and rafted by it; and the bills for services were made out by it, and the same were paid by plaintiff. If it was the intent of the defendant company to make a difference in the rate charged for the logs cut from lands other than those owned by the plaintiff, it should have done so when the services were rendered. There is nothing in the history of the case, as developed in the evidence, that would justify the finding that the plaintiff had misled the defendant company, or that the action of the latter in driving all the logs owned by plaintiff, and charging the contract rates therefor, was induced by any lack of knowledge on its part of the actual situation of affairs. I therefore hold that the defendant company has failed to prove its counterclaim, and it cannot set off against the damages of the plaintiff any further charge for driving, handling, and delivering the logs by it received and delivered prior to April 4, 1889.

This brings us to the question of the quantity of timber which the defendant company wrongfully refused, in April, 1889, to receive and handle under the contract. A preliminary question arises upon the proposition that the scale books offered in evidence by the plaintiff are not competent, not being the best evidence upon the point of the quantity of logs cut from plaintiff's land. The evidence shows that as the logs are cut in the woods they are scaled—that is, measured to ascertain their contents—by persons known as "camp scalers," and the measurements are entered upon cards. At the close of the day the measurements thus taken are entered upon the scale book. From time to time, inspectors visit the camps, and verify the contents of the scale books by counting and remeasuring a sufficient

portion of the logs to satisfy them of the correctness of the books. If errors are detected the book is corrected. After verification and correction by the inspectors, the scale book is sent to the owner of the logs, and payment is made to the log cutters and handlers according to the contents of the book, which is thus made the evidence upon which the owner of the logs must make payment to his employes. It is clearly to the interest of the logowner that these scale books shall not show the cutting of any greater number of logs than the facts will justify. The mode by which the entries are made on the scale book is such as to assure accuracy therein. The parties who cut and haul the logs, and the owner, who is to pay for the cutting and hauling, act upon the contents of the books, and deem them to be proper evidence of the facts therein stated. That which is received and acted upon by persons engaged in any line of business as competent evidence is ordinarily admissible when the same fact becomes a matter of inquiry in judicial proceedings. It would seem, therefore, that the scale books should be admitted in evidence, unless it appears that there is better evidence within the power of plaintiff to produce. It is said that the camp scalers should have been hunted up, and their testimony be introduced, in order to show the number of logs, and the contents thereof, cut on plaintiff's land during the time in controversy. What is sought to be proved is the result, in number and quantity, of the logs cut. When the scalers made the count and measurement, two records thereof were made,— one in the memory of the scaler, the other in the scale book. Which is now the best evidence? Years have elapsed. The entries on the scale books remain unchanged. They are now just what they were when originally made. Can the same be said of the record made upon the memory of the scalers? If the scalers had been produced and had testified that in the years past they had counted and measured a large quantity of logs, and had at the time entered the results upon scale books prepared for the purpose, and that, as they now remembered it, the number and quantity were so and so, but, upon the production of the scale books, they showed a different quantity and measurement, which should control? The rule requiring the production of the best evidence of which the case is susceptible is intended to guard against fraud and mistake, and to aid in arriving at the truth. That evidence which is the least liable to mislead is the best evidence; and it cannot be maintained that there is more reliable evidence of the number and quantity of the logs cut upon plaintiff's land than the scale books wherein the entries were made from day to day by the camp scalers, and which were revised and corrected by the inspectors. The books were properly identified, and the inspectors who revised them at the different camps testified to their correctness; and, under these circumstances, I hold that the books cannot be excluded upon the ground that it appears that there is better evidence adducible upon the question of the number and quantity of logs cut by plaintiff, and placed in the waters of the Chippewa and Flambeau rivers. According to the entire evidence, it appears that at the date of the contract, to wit, August 23, 1882, there were then in the streams logs, which the defendant was bound to

handle, under the contract, to the amount of 14,901,430 feet. The total feet afterwards placed in the streams, from all sources, up to and including the season of 1890–91, was 134,038,390 feet, according to the bank scale measurement. It is strenuously claimed on behalf of the defendant that owing to the loss of logs, from various causes, and differences in the mode of scaling, the measurement at the time of delivery, which is known as the "boom scale," will always fall short of the bank scale, and that a deduction of 12½ per cent. from the bank scale should be made therefor. That some allowance should be made for lost logs, and the like, cannot well be denied; but I think the estimate of 12½ and 15 per cent., made by some of the witnesses, is entirely too high. If an allowance of 5 per cent. is made, to cover all the differences that should be reasonably expected to exist between the bank and boom scales, in my judgment, it would not be far from the correct percentage of difference. Making a 5 per cent. deduction, it follows that, of the 14,901,430 feet of logs in the streams at the date of contract, there should be delivered, at boom scale, the amount of 14,225,859 feet. Of the total amount of 134,038,390 feet of logs put in the streams after the date of the contract, about 73 per cent. thereof were cut from lands owned by plaintiff at the date of the contract, or the sum of 97,848,024 feet, at bank scale. At the date of the breach of the contract, to wit, April 4, 1889, there was standing, uncut, on plaintiff's land, 3,869,000 feet of pine timber, at bank scale. The aggregate of these two amounts, or the sum of 101,717,024 feet, represents the timber cut, bank scale, covered by the contract, in addition to that in the streams, as above stated. Reducing this aggregate to boom scale, by subtracting 5 per cent., we have the sum of 96,631,173 feet, which, added to the 14,225,859 feet in the streams at date of the contract, gives us the final total of 110,857,032 feet as the amount of timber covered by the contract at boom scale, and which the defendant was bound to drive, handle, and deliver at contract prices. It is admitted that, of all the logs taken possession of by defendant, there was delivered up to April 4, 1889, at boom scale, the sum of 93,997,580 feet, being logs derived from all sources; and, as the estimate is that 73 per cent. of the total came from lands owned by plaintiff at the date of the contract, it follows that 73 per cent. of the total delivery, or the sum of 68,618,233 feet, is to be credited as delivered under the contract, leaving a difference of 42,238,799 feet, upon which the plaintiff has or will be called upon to pay prices exceeding those named in the contract. The excess charged for driving, brailing, and scaling amounts to 38½ cents per 1,000 feet, from which is to be deducted the contract price of $250 per year for driving. It is also admitted that in 1889 the plaintiff paid an extra 5 cents per 1,000 for brailing 7,005,490 feet, or the sum of $350.27. Thus we find that the excess of 38½ cents per 1,000 on the total amount of logs not driven and handled under the contract, to wit, 42,238,799 feet, amounts to $16,261, from which is to be deducted the sum of $1,000 for four years' driving at the contract price of $250 per year, the difference being $15,261 to which must be added the $350.27, excess paid in 1889, thus giving a final total of $15,611. As part of the pay-

ments are yet to be made, it is probably fair to date the allowance of interest from the commencement of the suit, to wit, November 29, 1889; or, in round numbers, interest will be allowed for four years and four months, making the total amount of damages $19,-669.85. It was admitted on the trial that of the charges in excess of the contract rates, which are allowed as damages, there is due the defendant company the sum of $3,460; and as plaintiff, having been allowed damages for this excess, is bound to pay them to the defendant, the amount should be deducted from the total damages as above stated, thus leaving a net sum due plaintiff of $16,209.85, for which judgment in his favor is ordered against defendant.