### LINK BELT ENGINEERING CO. v. UNITED STATES.

(Circuit Court, E. D. Pennsylvania.   December 30, 1905.)

#### No. 74.

CONTRACTS—DELAY IN COMPLETING BUILDING—STIPULATED DAMAGES.

A contract for the construction of a part of a building for the United States provided that a stipulated sum should be deducted from the contract price as liquidated damages for each day's delay in the completion of the work after the time therein fixed. *Held*, that a delay caused by the inability of the contractor to obtain certain steel work in time, owing to the congested condition of work in the steel mills, was not unavoidable, and did not relieve the contractor from the payment of the stipulated damages, where such condition was known when the contract was made, and was supposedly guarded against by the contractor by making the time for the completion of the work much longer than would ordinarily have been required.

At Law.

Arthur Smith, Chas. F. Gummey, and M. Hampton Todd, for plaintiff.

John C. Swartley and J. Whitaker Thompson, for the United States.

J. B. McPHERSON, District Judge. This suit is brought, and was tried without a jury, under the Act of March 3, 1887, c. 359, 24 Stat. 505, 1 Supp. Rev. St. 559 [U. S. Comp. St. 1901, p. 752], to recover a balance said to be due upon a contract whereby the plaintiff undertook to furnish certain materials and do certain work for the government at the Washington Navy Yard. In obedience to section 7 of the act, which provides:

"That it shall be the duty of the court to cause a written opinion to be filed in the cause, setting forth the specific findings by the court of the facts therein and the conclusions of the court upon all questions of law involved in the case, and to render judgment thereon,"

I find the following facts to be established by the evidence:

1. In January, 1902, the government advertised for proposals for building a steel roof and coal handling appliances for ordnance boiler house, building No. 109, at the Washington Navy Yard. On February 15th, the plaintiff proposed to furnish and construct the roof and appliances referred to, and this proposition, with some modifications, was accepted by the government on March 28th. The modifications were agreed to by the plaintiff on March 29th, and on April 4th the contract was executed. It provided, inter alia:

"That the said party of the first part will provide, furnish and deliver, at its own risk and expense, at the United States Navy Yard, Washington, D. C., all the necessary materials, labor, tools, and appliances for the construction and completion, in all respects, of the steel and iron work for the roof of a building, and certain coal handling machinery and coal and ash pockets for the same, at said navy yard, and will construct and complete the same within seven calendar months from the date of this contract, in strict accordance with, and subject to, all the conditions and requirements of the plans and specifications appended hereto and forming a part hereof, and of memoranda likewise appended, for the sum of eighteen thousand one hundred and forty-six dollars ($18,146)."

Elaborate specifications and plans accompanied the contract, and with reference to the plans it was provided by section 23 of the specifications as follows:

"Plans.—Four plans, numbered 18,070, 18,071, 18,072, and 18,073, and dated August 22, 1901, accompany this specification. This specification and the plans accompanying it are to be considered as supplementary one to the other, so that materials and workmanship shown, called for, or implied by the one and not by the other shall be supplied and worked into place the same as though specifically called for by both. All detail plans that may be furnished subsequently in further amplification, as well as all instructions given by the officer in charge that may be necessary to more fully indicate the intention of the specification and the above-mentioned plans, are to be followed and considered as though forming a part of the original contract. For all portions of the work the contractor shall submit the necessary detail plans to the officer in charge for approval, unless otherwise directed by him, before proceeding with the work. These details must conform to the letter and spirit of the specification, to any supplementary data and instructions, and to the general and detail plans already furnished the contractor. Plans are to be submitted to the officer in charge in blue-print form in duplicate. One copy will be returned to the contractor either 'approved' or 'to be revised,' as noted thereon. In the latter case the necessary corrections shall be made and duplicate blue-prints of the revised drawings submitted before proceeding with the work. Approval of plans will be of a general nature and will not relieve the contractor from errors or omissions that may exist therein. Previous to

final payment the contractor shall have furnished the Bureau of Yards and Docks, through the officers in charge, one complete set of blue-prints on linen of all approved plans for retention and filing."

2. In accordance with the section just quoted, the plaintiff submitted certain plans in the following letter:

"Nicetown, Philadelphia, May 1, 1902.

"Mr. Mordecai T. Endicott, Chief of Bureau of Yards and Docks, Washington, D. C.—Dear Sir: We are inclosing herewith two blue-prints of drawing No. 1,385, showing the coal pocket for ordnance boiler-house, on contract awarded to us under your specifications No. 1,212. We are submitting these to you for criticism or approval, in accordance with article No. 23 of the specifications, and will await your approval before proceeding with the work.

"Very truly yours,      The Link Belt Engineering Company,
"Charles Piez, Chief Engineer."

To this the government replied as follows:

"Washington, D. C., May 29, 1902.

"Gentlemen: Referring to your letter of May 1st and plan No. 1,385 of coal pocket, accompanying same, while the general requirements as regards strength and shape of pocket appear to be met, the bureau is not satisfied with the thickness of material of some of the members that will be in contact with coal.

"2. In order to make the pocket satisfactory a redistribution of metal is desired as follows:

"(a) Change the roof purlins from Z-bars to 7" channels, 9.75 lbs. per foot. It is estimated that this will reduce the weight about 7,900 lbs.

"(b) Change the thickness of metal in the coal pocket as shown generally on the blue-print which is returned herewith, and the thickness of the 12" chutes from $\frac{1}{8}$" to 3-16", so that the increase will be equal to the decrease caused by the change in the purlins.

"3. Please submit revised blue-prints in duplicate in accordance with the above.

"Very respectfully,      Mordecai T. Endicott, Chief of Bureau.
"Link Belt Engineering Co., Nicetown, Philadelphia, Pa."

On June 6th the plaintiff submitted revised plans carrying out the change requested by the letter of May 29th and these plans were finally approved by the proper bureau on June 20th. To this approval the plaintiff replied as follows:

"Nicetown, Philadelphia, June 24, 1902.

"Mr. Mordecai T. Endicott, Chief of Bureau of Yards and Docks, Navy Department, Washington, D. C. Dear Sir: We have your favor of the 20th signifying your approval of the construction of coal pocket in Boiler-House No. 109, as shown in print No. 1,385, and will now proceed with the work.

"Very truly yours,      The Link Belt Engineering Company,
"F. V. Hetzel, Asst. Chief Engineer."

3. The roof was not erected until the end of November, 1902, nor the pocket until August, 1903. The delay was caused by the condition of the steel market; the manufacturers being so overrun with orders that the plaintiff could not secure delivery of the needed material as soon as was expected at the time when the contract was made. Section 12 of the specifications is as follows:

"Damages for Delay.—In case the work is not completed within the time specified in paragraph 9, or the time allowed by the Chief of the Bureau of Yards and Docks under paragraph 10 of this specification, it is distinctly understood and agreed that deductions at the rate of $10 per day shall be made

from the contract price as liquidated damages, and not as penalty, for each and every calendar day after and exclusive of the date within which completion was required, up to and including the date of completion and acceptance of the work, said sum being specifically agreed upon in advance as the measure of damage to the United States by reason of delay in the completion of the work; and the contractor agrees and consents that the contract price, reduced by the aggregate of damages so deducted, shall be accepted in full satisfaction for all work done under the contract."

Under this section the government withheld $2,900 for a delay of 290 days, but afterwards agreed that 110 days' extension of time should be allowed for Sundays and legal holidays, and for the time consumed in the preparation, checking, and approval of working drawings. This sum, $1,100, has not yet been paid to the plaintiff.

The only question involved in the case is whether the plaintiff is liable for the delay caused by the inability of the manufacturer to furnish the material in time to allow the work to be done within the seven months specified in the contract. Sections 13 and 14 of the specifications are as follows:

"Unavoidable Delays.—Unavoidable delays are such as result from causes which are undoubtedly, or may reasonably be presumed to be, beyond the control of the contractor, such as acts of Providence, unusual storms, fires (not the result of negligence), fortuitous events, inevitable accidents, etc. Delays caused by acts of the United States will also be regarded as unavoidable delays. Should the progress of the work be, or seem likely to be, delayed at any time by such causes, the contractor shall at once notify the officer in charge, in writing, of the occurrence, in order that a record of the same may be made. Should it be decided that the delay was unavoidable, a corresponding extension of time for the completion of the work may be allowed, but it is distinctly understood that should the contractor fail or neglect to notify the officer in charge as above provided, such omissions shall be construed as a waiver of all claim and right to an extension of time for the completion of the work on account of such delay.

"Avoidable Delays.—Avoidable delays are such as result from causes which the contractor might, by care, prudence, or foresight, have guarded against or prevented. No extension of time will be allowed on account of such delays."

The provisions of the thirteenth specification, regarding the manner of giving notice, were not complied with by the plaintiff. Indeed, no notice at all was given, as is contemplated by this section; and, if it be contended that conversations with officials were equivalent to such notice, I think it is sufficient to reply that section 19 of the specifications provides that

"Verbal Modifications.—It is distinctly understood that no verbal statement of any person whomsoever shall be allowed in any manner or degree to modify or otherwise affect the terms of this specification or of the contract for the work. Changes shall be made only and strictly according to paragraph 17 of this specification."

Undoubtedly the plaintiff knew, at and before the date of the contract, of the congested condition of the steel market, and supposed that the risk of failure to secure material was sufficiently guarded against by proposing seven months as the time for completing the work. It was testified that ordinarily a contract of this size could be executed in three months, and that seven months was "a good long time." In other words, the contractor exercised his foresight to provide for the delay which he saw was inevitable, but was mis-

taken in his estimate of the future. This is not an unavoidable delay, within the meaning of section 13 of the specification. It is a delay due to the contractor's error of judgment, and I do not see upon what ground he can ask to be excused from the consequences of his own mistake. The delay in beginning the work was occasioned by the time required for the preparation and approval of ,the detailed drawings, but (aside from the fact that these drawings were expressly called for by the contract) an allowance has been made for this initial delay, and the plaintiff will receive an award for the proper amount.

The case is governed, I think, by the ruling that is thus expressed in Chicago, etc., Railway Co. v. Hoyt, 149 U. S. at page 14, 13 Sup. Ct. at page 784 [37 L. Ed. 625] :

"There can be no question that a party may, by an absolute contract, bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance, and such construction is to be put upon an unqualified undertaking where the event which caused the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But, where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of, the particular contingency which afterwards happens."

See, also, Dermott v. Jones, 2 Wall. 1, 17 L. Ed. 762; Texas, etc., Railway Co. v. Rust (C. C.) 19 Fed. 239; Central Trust Co. v. Railway Co. (C. C.) 31 Fed. 440; Robson v. Logging Co. (C. C.) 61 Fed. 893.

Believing, therefore, that the plaintiff is only entitled to the sum for which the government expressly agreed to make an allowance I find that the plaintiff is entitled to recover the sum of $1,100, and for that amount the clerk is directed to enter judgment in its favor.