**JOHN H. DULANY & SON, Inc. v. UNITED STATES.**

No. 48521.

United States Court of Claims.

Decided May 1, 1951.

John W. MacVey, Washington, D. C. (H. Russell Bishop, Washington, D. C., on the brief), for plaintiff.

William A. Stern, II, Washington, D. C., H. G. Morison, Asst. Atty. Gen. (R. W. Koskinen, Washington, D. C., on the brief), for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff sues to recover the sum of $3,986.11 under a fully performed contract for the sale and delivery of canned green beans by plaintiff to defendant. Defendant claims that plaintiff is liable to it in this amount for certain unpaid "rent" for Government-owned dehydrating machinery used in connection with a wartime food procurement project. Defendant has set off this amount of $3,986.11 against the amount due to plaintiff under its canned green bean contract. Plaintiff, therefore, brings this action to recover this amount so withheld.

The question of whether the plaintiff is entitled to recover this amount here involved depends upon the legal effect to be given to the arrangements for the construction and operation of the wartime dehydration project, since the plaintiff's right to payment under the later and unrelated contract for the sale and delivery of canned beans is not disputed. Briefly, the facts involved in this dispute are as follows:

In the fall of 1942, plaintiff became interested in the Government's program of dehydrating vegetables to provide additional foodstuffs for wartime uses. Previous to that time plaintiff had been engaged in the business of canning and processing fruits and vegetables, but it had no experience in the newly developed business of dehydrating vegetables, nor did it possess the special equipment required for that business.

Previous to the acquisition of the contracts with the Government, which will be later discussed, plaintiff had obtained certain knowledge and information relating to a new process for curing sweet potatoes before dehydration. This process not only reduced the usual losses that result from rotting but also improved the quality of the potatoes. However, as indicated above, to put this new process into effect additional machinery and facilities were necessary.

On January 16, 1943, plaintiff and defendant (through the Department of Agriculture) entered into a written contract whereby it was agreed that plaintiff would install enumerated dehydrating equipment in its plant; that upon installation defendant would pay to plaintiff the cost thereof, take title thereto, and lease same to plaintiff. This instrument was acknowledged by the plaintiff January 14, 1943, and by the Government, through its contracting officer, on June 15, 1943. Delay in the contracting officer's acknowledgment was due to the consideration of the question of including a two-stage predryer, which was finally included, and the contract price was raised accordingly.

The contemporaneous lease of machinery in accordance with the aforesaid contract was entered into by the parties and, among other things, the lease provided that the plaintiff would first offer the dehydrated products to the Government. If the Government did not buy them, then plaintiff might dispose of such products to any other purchasers but not at lower prices without first offering such products to the Government at this lower price. There was also a provision that if the Government agency did not in any period of 30 consecutive days indicate an intention to purchase or otherwise acquire any products offered to the governmental agency, the plaintiff might sell such products at any price. Further, that plaintiff could terminate the lease if the Government failed to buy at least 500,000 pounds of dehydrated products within any full year.

This lease was later amended on January 18, 1944, and provided that title to the machinery should be considered as having been vested in the Government on June 1, 1943, for rental purposes, the terms of the lease, and the computation of depreciation.

Article 8 of the lease provided that: "Lessees shall, * * * after each three-month period during the life of this Lease, deliver to a Governmental Agency * * * a quantity of such products as the Governmental Agency may designate, the total value of which shall be an amount equal to 5 percent of the total consideration paid Lessees for the facility by the Government * * *. The quantity of the designated products to be delivered shall be determined by dividing said amount * * * by (a) the price per pound at which such products * * * were last sold by the Lessees to the Governmental Agency during the preceding three months, or, if no such products were sold to such Agency during such months, (b) the reasonable market price * * *. The Governmental Agency, however, may, at its option, require * * * that all or any part of the value thereof be paid in cash."

Provision for termination was made in Article 12 of the lease which provided that: "At any time after the date of a declaration by the President that the facility is no longer needed by the United States of America * * * this Lease if still in effect, may be terminated by the Lessees upon 90 days' written notice to the Secretary."

The dehydrating machinery was installed early in 1943, and relatively small amounts of sweet potatoes were dehydrated in February and March of that year. Full-scale dehydration could not be undertaken by plaintiff with its facilities until the end of the canning season which was near the close of the year.

On March 27, 1943, plaintiff wrote to the Department of Agriculture suggesting the advisability of providing more space for the storing and curing of sweet potatoes prior to dehydration. This proposal led to a conference on April 9, 1943, between plaintiff and representatives of the Department of Agriculture, held for the purpose of discussing the erection of sheds for the storing and curing of sweet potatoes. As a result of these discussions, the representatives of the Department of Agriculture agreed that they would consider the possi-

bility of making the necessary recommendations so that the curing sheds could be financed by some other governmental agency possessing the power and facilities for making loans for such purposes. A later conference was held on April 29, 1943, with representatives from the Department of Agriculture as well as representatives from the University of Maryland who were conversant with the process of curing sweet potatoes for dehydration. After a discussion of the facilities needed by the plaintiff for the curing process, the conference adjoined to the office of the Defense Plant Corporation where it was agreed that this Corporation would proceed to give its aid to the project. Other conferences followed relative to details and extended to July of 1943.

On July 17, 1943, the War Foods Administration wrote to the Defense Plant Corporation and transmitted plaintiff's application for financing special curing sheds together with the statement that these facilities were considered by the Army as essential to the improvement of the equality of dehydrated sweet potatoes, and that the Department of Agriculture considered construction of such sheds as essential and recommended the financing and construction thereof as requested by the plaintiff.

This application was approved, and on August 2, 1943, plaintiff and the Defense Plant Corporation entered into a written agreement which, among other things, provided that plaintiff would lease certain land to the Defense Plant Corporation; that the Defense Plant Corporation would advance funds which would enable plaintiff to construct the curing sheds; that title to the land and buildings was to be conveyed to the Defense Plant Corporation; and that such Corporation would then sublease the land and buildings back to plaintiff. There was a further provision that this sublease could be terminated by either party on thirty days' notice upon representation of cessation of substantial use for government purposes. Plaintiff was to pay rent equal to two and one-half percent of its aggregate net sales of dehydrated products in each year the sublease existed. The contracts for the curing sheds made no mention of the leasing of machinery.

Actual construction of the curing sheds began sometime between August 5 and 9, 1943, and the building was substantially completed October 1, 1943, which is approximately the time sweet potatoes in the nearby vicinity from which plaintiff secured them were ready to harvest.

With its own facilities and those provided by the Government, plaintiff proceeded to fill orders from the Government for dehydrated food products. By September 5, 1945, the Army had canceled a considerable contract with plaintiff for dehydrated sweet potatoes, and on that date plaintiff wrote to defendant's representatives in the Department of Agriculture pointing out the cancellation of the Army contract and its own inability to find a civilian market for the products, and requesting that because of these developments it be relieved of the dehydrating machinery and the obligation to pay rent thereon. In this letter plaintiff also stated that there was no clause in the lease to take care of the situation and requested that "something be done in an informal way to give us relief." Defendant replied on September 18, stating that a telegram had been sent to plaintiff on September 13, regarding a proposed contract to supply dehydrated sweet potatoes to the Department of Agriculture. However, plaintiff never replied to the letter and neither did it pay rent on the machinery after November, 1945.

From an inspection of plaintiff's canning plant in the fall of 1945, made by an engineer employed by plaintiff for that purpose, it became apparent that repairs to this structure were needed or that the structure required complete replacement. Temporary repairs were made in October of 1945, but the building proved unsafe for a full season's operation, and the plaintiff had it demolished early in January of 1946. Construction of the new building began January 5, 1946, and was completed in June of the same year. During this entire period of demolition and construction, operation of the dehydration plant was impossible.

On March 21, 1946, the Acting Secretary of Agriculture executed a "Declaration of Non-Necessity" of the dehydrating machinery lease. Plaintiff received notice thereof on March 25 and on March 27 gave its notice of termination of the machinery lease in accordance with Article 12 thereof, which will be discussed later in this opinion. By letter dated April 1, 1946, defendant advised plaintiff that the date of termination would be June 25, 1946 (90 days after the receipt of the termination notice as required by the contract) and that the rent from December 1, 1945, through June 25, 1946, would be $3,986.11, which is the amount now in controversy.

On August 21, 1946, the Reconstruction Finance Corporation (successor to the Defense Plant Corporation) advised the plaintiff that the curing sheds were no longer required for government purposes and that the sublease thereon would be terminated effective 30 days after receipt of that notice. This termination procedure was provided for in the curing shed contract previously entered into by the parties.

Plaintiff neither replied to the letter of the Department of Agriculture nor paid the rent stated to be due. The relations between plaintiff and defendant remained in this unsettled state until June of 1948 when plaintiff sold a quantity of canned green beans to the defendant for the sum of $4,450.65. Defendant thereupon deducted $3,986.11 as rent due under the machinery lease here in issue and tendered plaintiff a check for $464.54 which plaintiff accepted without prejudice to its rights in the remainder.

Plaintiff urges three propositions in support of its claim: (1) that pursuant to Section 202 of the War Mobilization and Reconversion Act of October 3, 1944, 58 Stat. 787, 50 U.S.C.A.Appendix, § 1657, defendant was required to terminate plaintiff's machinery lease contract because this contract was a prime war contract and its performance was no longer needed for the prosecution of the war; further that Section 202 supersedes Article 12 of the lease contract relative to termination; (2) that rent or amortization charges payable under Article 8 of the machinery lease contract were to be paid only from receipts of Government orders, and in the absence of such orders during the period in question no liability for rent arose; further that a sentence in Article 8 of the contract permitting the Government to elect to be paid in cash, makes the whole article ambiguous, and accordingly the contract should be construed as providing for the same amortization or rent terms as were contained in the Defense Plant lease for the curing sheds; (3) that in any event, no liability for rent on the part of plaintiff arose during the period in question because the contract became impossible to perform by reason of the fact that it became necessary for plaintiff to rebuild its canning plant adjacent to the building containing the dehydrating machinery.

With respect to plaintiff's first ground for recovery, Section 202 of the War Mobilization and Reconversion Act provides as follows: "Any contracting agency shall terminate prime contracts for war production whenever in the opinion of the agency the performance under such contracts will not be needed for the prosecution of the war, and shall not continue performance under such contracts merely for the purpose of providing business and employment, or for any purposes other than the prosecution of the war, unless the Office of War Mobilization and Reconversion finds that the continuation of some or all of the work in process under any such contract will benefit the Government or is necessary to avoid substantial physical injury to a plant or property."

Defendant says first that the machinery lease contract was not a prime war contract within the meaning of the above section; that, on the contrary, the prime war contract was plaintiff's contract to furnish dehydrated products to the Army. With this contention, we agree. The use of the dehydrating machinery under the lease contract was not restricted to war production, as the machinery might be used by plaintiff to supply products to civilian purchasers whenever the Government did not require the products. The contract actually contemplated that plaintiff might wish to continue civilian production of dehydrated

products after the war and accordingly provided that the plaintiff might repurchase the leased machinery. The record discloses that at the end of the war plaintiff attempted to find civilian outlets for its product and failing that, requested the Government to terminate the lease. Had plaintiff found a civilian outlet, it would, and could properly, have objected to defendant's termination under Section 202.

In any event, assuming (as plaintiff contends) the lease to have been a prime war contract, the defendant's authority to terminate the contract under Section 202 was discretionary, and the act provided for no appeal from the defendant's action or failure to act under the Section. The Section did not, of itself, cancel the contract, and the defendant's failure to exercise its power thereunder to cancel did not give rise to a cause of action in plaintiff. Defendant's refusal to cancel might well be held to be an exercise of its discretion under the Section, and this court has no power to review such action. See Griffin v. United States, 88 Ct.Cl. 522.

Prior to a declaration by the President of nonnecessity under Article 12 of the contract, the Government could only have terminated under Articles 7 or 13 for default. What defendant did, and we think quite properly, was to bring about the termination of plaintiff's lease contract under the terms of Article 12 of the contract which provide as follows: "At any time after the date of a declaration by the President that the facility is no longer needed by the United States of America * * * this lease if still in effect, may be terminated by the Lessees upon 90-days' written notice to the Secretary."

Neither are we able to agree with plaintiff's second ground for recovery to the effect that no rent became due in the absence of Government orders for the materials produced by the machinery leased. Article 8, providing for rent of the leased machinery, is quite unambiguous. It provides simply that payment shall be made by the delivery to defendant of a certain percentage of plaintiff's production and that defendant may, at its option, require payment of an equivalent sum in cash. The existence of this option does not make the clause ambiguous. Defendant had paid plaintiff for the machinery and was leasing it back to the plaintiff at a certain rental. Plaintiff was permitted to sell its products to civilian purchasers whenever the Government did not require them, but even under those circumstances, plaintiff was obliged to pay its rent on the machinery to defendant in produce or, at the defendant's option, in cash.

We can see no valid reason for construing the rental provision of this contract in the light of the provisions for rent in the curing shed sublease. The "overlapping chronology" of the two contracts, relied on by plaintiff, is without real significance. The machinery lease contract in suit was executed by plaintiff in January 1943, and the delay in defendant's acknowledgment of that contract had no connection with the negotiation of the other contract for the curing shed facilities (Finding 4). After the terms of the machinery lease contract had been substantially agreed on, the curing shed project was initiated and the Government finally decided to finance the necessary facilities. The contract providing for the financing of such facilities and the contract providing for the lease of machinery were entirely separate and, with respect to the terms of amortization or rent payment, quite different. Furthermore, we find nothing in the record to indicate an intention on the part of the defendant and plaintiff to treat the two contracts as part of a single transaction. Both the negotiations prior to execution of the contracts and the actions of the parties during the operations thereunder indicate conclusively that the two contracts were separate and distinct.

With respect to plaintiff's final ground for recovery, i. e., impossibility of performance, defendant says, and we agree, that the impossibility arising in this case was not of the character which would have excused plaintiff's performance under the machinery lease. The impossibility, pleaded by plaintiff, arose from the necessary demolition of the canning plant which had deteriorated to the point where it could

no longer be used. As pointed out by defendant, the complete deterioration of this building in 1945 could, and certainly should, have been anticipated by plaintiff in 1943 when the machinery contract was made and was, therefore, not an unforeseen circumstance which could not have been reasonably anticipated and guarded against. Berg. v. Erickson, 8 Cir., 234 F. 817, L.R.A. 1917A 648; Williston on Contracts, § 1953, at p. 5476. Furthermore, the building demolished was not the building housing the machinery leased, but was adjacent thereto, and its destruction had no effect on the machinery.

A review of all the facts involved in this case leads us to the conclusion that the terms of the lease providing for the payment of rent for the dehydrating machinery are clear and unambiguous, and that, accordingly, plaintiff is not entitled to recover the $3,986.11 withheld under its subsequent contract.

Plaintiff's petition is therefore dismissed.

MADDEN, WHITAKER and LITTLETON, Judges, concur.

JONES, Chief Judge, took no part in the decision of this case.