BERG v. ERICKSON (two cases).

(Circuit Court of Appeals, Eighth Circuit. July 8, 1916.)

Nos. 4518, 4519.

*(Syllabus by the Court.)*

**1.** CONTRACTS ⬤⟹303(3)—PERFORMANCE—EFFECT OF IMPOSSIBILITY.

E., a resident of Kansas, in April, 1913, showed to B., a resident of Texas, who had had no experience of Kansas grass, or of the effects upon it of droughts, which were not unusual in some parts of Kansas, certain pastures in which he proposed to put, and into which he after- wards did put, B.'s cattle. Thereupon, on April 16, 1913, E. made a written contract with B. to furnish about 1,000 of his cattle plenty of good grass, salt, and water during the grazing season of 1913, and B. agreed to pay him therefor $7 a head. An act of God, the worst drought that had ever been known in Kansas, made it impossible for E. to fur- nish plenty of good grass in July, August, September, and October of that year, to the damage of B. in the sum of $20,000, but did not prevent him from furnishing plenty of good grass during May and June, and sufficient grass to keep the cattle alive and maintain their weight during the remainder of the season.

*Held*, E. was not absolved from his liability to furnish plenty of good grass, or to pay the damages for his failure so to do, by the act of God, the unprecedented drought.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1412–1416; Dec. Dig. ⬤⟹303(3).]

**2.** CONTRACTS ⬤⟹303(3)—PERFORMANCE—EFFECT OF IMPOSSIBILITY.

Where an obligation or a duty is imposed on a person by law, he will be absolved from liability for nonperformance of the obligation if his performance is rendered impossible without his fault by an act of God, or an unavoidable accident. But this rule is not generally applicable to contract obligations.

Whether or not one, who by contract imposes upon himself an obliga- tion or duty, is absolved from liability for its nonperformance by a subse- quent impossibility of performance without his fault, caused by an act of God or an unavoidable accident, depends upon the true construction of his contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1412–1416; Dec. Dig. ⬤⟹303(3).]

**3.** CONTRACTS ⬤⟹303(3)—PERFORMANCE—EFFECT OF IMPOSSIBILITY.

The general rule is that one, who makes a positive agreement to do a lawful act, is not absolved from liability for the failure to do it by a subsequent impossibility of performance, caused by an act of God or an unavoidable accident, for the reason that he voluntarily contracts to perform it, without reservation or exception, which, if he desired, he could make in his agreement, thereby induces the other contracting party, in consideration of his positive agreement, to enter into and be- come bound by the contract, and while courts may enforce, they may not avoid contracts, in the absence of fraud or some similar ground.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1412–1416; Dec. Dig. ⬤⟹303(3).]

**4.** CONTRACTS ⬤⟹303(1)—PERFORMANCE—EFFECT OF IMPOSSIBILITY.

Where it clearly appears, from the situation of the parties at the time they made their contract and from its terms, that they must have known that its performance would be impossible unless a person or persons, as in a contract of marriage, or in a contract for personal service, as of a singer or artist, should be living at the time for the performance of the

contract, and there is no express or implied warranty of his life, a condition is implied that the contractor shall be absolved from liability if performance becomes impossible without his fault by the death of the indispensable person. A like condition is implied in a contract for the delivery of a specific animal under like conditions.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1409; Dec. Dig. ☜303(1).]

5. PERFORMANCE OF CONTRACT—EFFECT OF IMPOSSIBILITY.
There are authorities to the effect that, where it clearly appears from the situation of the parties and their contract that they must have known when they made it that its performance would be impossible unless a thing, or a condition of things, then in existence should continue until the time of performance, or unless an indispensable thing, or condition of things, not then in existence should come into existence before and be in existence at the time of performance, there also, in the absence of an express or implied warranty of the existence of the indispensable thing or condition at the time of performance, there arises an implied condition that if that thing or condition is destroyed or prevented without fault of the obligor by the act of God, or by unavoidable accident, the obligor shall be absolved from liability for his failure to perform.

6. CONTRACTS ☜303(1)—PERFORMANCE—EFFECT OF IMPOSSIBILITY.
The decisions of the federal courts do not go so far. The rule declared by the Supreme Court is that, although general words which cannot be reasonably supposed to have been used with reference to the possibility of an event may not be held to bind one, yet where one at the time of making his contract must have known, or could have reasonably anticipated, and in his contract could have guarded against, the possible happening of the event causing the impossibility of his performance, and nevertheless he makes an unqualified undertaking to perform, he must do so, or pay the damages resulting from his failure so to do.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1409; Dec. Dig. ☜303(1).]

Appeal from and in Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by J. C. Berg against John Erickson. Judgment for defendant, and plaintiff brings error. Suit in equity by John Erickson against J. C. Berg. From a decree for complainant, respondent appeals. Reversed, and remanded for new trial.

C. H. Brooks, of Wichita, Kan. (J. D. Houston, of Wichita, Kan., on the brief), for appellant and plaintiff in error.

J. T. Lafferty, of Kansas City, Mo. (W. P. Hackney, of Winfield, Kan., Aikman & Aikman, of Eldorado, Kan., and L. D. Moore, of Winfield, Kan., on the brief), for appellee and defendant in error.

Before SANBORN, Circuit Judge, and REED and BOOTH, District Judges.

SANBORN, Circuit Judge. John Erickson, a resident of Kansas, made a written contract with J. C. Berg, a resident of St. Francis, Texas, on April 16, 1913, to pasture for him 1,000 steers and to "furnish plenty of good grass, water, and salt during the grazing season of 1913" to them for $7 per head, which Berg agreed to pay. Erickson furnished the grass, water, and salt to them during May and June, but the most severe drought which had been known in that part of

Kansas subsequently prevailed, and on account of that drought it was impossible for Erickson to furnish, and he failed to furnish, plenty of good grass for the cattle during July, August, and September, to the damage of Berg in the sum of about $20,000; and the main question in this case is whether Erickson is liable to pay these damages to Berg on account of his breach of his contract, or is absolved from liability for them by the impossibility of performance which resulted from the drought after the contract was made. The question was presented in this way: At the end of the grazing season Erickson claimed an agister's lien on the cattle for the agreed price of the pasturing, $7 per head, and refused to deliver them until that price was paid. Thereupon Berg replevied the cattle upon a complaint in which he alleged his ownership and right to the possession of them, and that by the failure of Erickson to furnish the agreed grass the cattle were worth $33,000 less than they would have been if Erickson had performed his contract. Erickson denied liability for the damage to the cattle, on the ground that it was caused by the drought, an act of God, and pleaded his agister's lien and his right to the possession of the cattle thereunder. He also brought a suit in equity against Berg, in which he set forth and prayed the adjudication of his agister's lien for the $7 a head, and asked further relief. Berg in his answer to this complaint denied the existence of any agister's lien, alleged Erickson's breach of his contract and his damage in the sum of $33,000, pleaded a counterclaim for these damages, and asked a judgment for their recovery.

The action in replevin and the suit in equity were tried together by the court below without a jury by consent of the parties. The court decided that Erickson had an agister's lien upon the cattle for the value of the grass furnished in the months of May and June, and for certain expenses which he incurred and the value of certain services which he rendered in caring for the cattle when they were ill, and in feeding them at the end of the grazing season, to the amount of $2,999.41, and rendered a judgment in the action in replevin for the return to him of the cattle, or for the payment to him of that amount. The court also held that Erickson was absolved from liability for his breach of his contract to furnish plenty of good grass by the unusual drought, and it rendered a decree in the suit in equity that Berg was indebted to Erickson in the sum of $2,999.41, that Erickson should have judgment for this amount in his action in replevin, and that Berg should take nothing on account of the damages he sustained by reason of Erickson's breach of his contract. Berg challenges the judgment by writ of error, and the decree by an appeal.

Erickson agreed to furnish plenty of good grass to the cattle throughout the grazing season of 1913. He failed to perform this contract, to the damage of Berg in the sum of $20,000, because the unprecedent drought made it impossible for him so to do. Did this impossibility of performance, which arose subsequent to the making of the contract, out of the unusual drought, the act of God, relieve Erickson from liability for the damages inflicted upon Berg by his failure to perform his contract?

[1, 2] An examination of the authorities and reflection have satisfied that the answer to this question must be deduced from a correct construction of the agreement of these parties under the following principles of law, which, notwithstanding the fact that there are confusing and conflicting decisions on cognate questions in the books, are established by the more convincing reasons and the greater weight of authority:

Where an obligation or a duty is imposed on a person by law, he will be absolved from liability for nonperformance of the obligation if his performance is rendered impossible without his fault, by an act of God or an unavoidable accident. But this rule is not generally applicable to contract obligations.

[3] Whether or not one, who by contract imposes upon himself an obligation or duty, is absolved from liability for his nonperformance by a subsequent impossibility of performance caused, without his fault, by an act of God or an unavoidable accident, depends upon the true construction of his contract. The general rule is that one, who makes a positive agreement to do a lawful act, is not absolved from liability for a failure to fulfill his covenant by a subsequent impossibility of performance caused by an act of God, or an unavoidable accident, because he voluntarily contracts to perform it without any reservation or exception, which, if he desired, he could make in his agreement, thereby induces the other contracting party, in consideration of his positive covenant to enter into and become bound by the contract, and while courts may enforce, they may not avoid, such contracts in the absence of fraud or some similar defense. 9 Cyc. 627, par. 5; Paradine v. Jayne, Allyn, 26; Central Trust Co. v. Wabash, St. Louis & P. Ry. Co. (C. C.) 31 Fed. 440, 441; Robson v. Mississippi River Logging Co. (C. C.) 61 Fed. 893, 900; Anderson v. May, 50 Minn. 280, 52 N. W. 530, 17 L. R. A. 555, 36 Am. St. Rep. 642; Stees v. Leonard, 20 Minn. 494 (Gil. 448); McGehee v. Hill, 4 Port. (Ala.) 170, 29 Am. Dec. 277, 278; School District No. 1 v. Dauchy, 25 Conn. 530, 68 Am. Dec. 371, 372, 374; Dermott v. Jones, 2 Wall. 1, 7, 8, 17 L. Ed. 762; The Harriman, 9 Wall. 161, 172, 173, 19 L. Ed. 629; Chicago, etc., Railway Co. v. Hoyt, 149 U. S. 1, 14, 15, 13 Sup. Ct. 779, 37 L. Ed. 625; Jones v. United States, 96 U. S. 24, 29, 24 L. Ed. 644; Jacksonville, etc., Ry. Co. v. Hooper, 160 U. S. 514, 528, 16 Sup. Ct. 379, 40 L. Ed. 515; Northern Pacific Ry. Co. v. American Trading Co., 195 U. S. 439, 466, 467, 25 Sup. Ct. 84, 49 L. Ed. 269; Link Belt Engineering Co. v. United States (C. C.) 142 Fed. 243, 247; Meriwether v. Lowndes County, 89 Ala. 362, 7 South. 198, 199; Ferguson v. Omaha S. W. R. Co., 227 Fed. 513, 523, 142 C. C. A. 145; Hoy v. Holt, 91 Pa. 88, 91, 92, 36 Am. Rep. 659; Adams v. Nichols, 19 Pick. (Mass.) 275, 277, 278, 31 Am. Dec. 137; Rowe v. Town of Peabody, 207 Mass. 226, 93 N. E. 604, 605, 606; Beach v. Crain, 2 N. Y. (2 Comst.) 86, 93, 49 Am. Dec. 369; Summers v. Hibbard, etc., & Co., 153 Ill. 102, 38 N. E. 899, 46 Am. St. Rep. 872.

[4] But where it clearly appears, from the situation of the parties at the time they made their contract and from its terms, that they

must have known that its performance would be impossible unless a person or persons, as in a contract of intermarriage, or in a contract for the personal service of an artist, such as a singer, should be living at the time for the performance of the contract, and there is no express or implied warranty of his life, a condition is implied that the contractor shall be absolved from liability if performance becomes impossible without his fault, by the death of the indispensable person. A like condition is implied in a contract for the delivery of a specific animal under like condition.

[5] There are authorities to the effect that, where it clearly appears from the situation of the parties and their contract that they must have known when they made it that its performance would be impossible unless a thing, or a condition of things, then in existence should exist at the time of performance, or unless an indispensable thing or condition of things not then in existence should come into existence before and remain in existence at the time of performance, there also, in the absence of an express or implied warranty of the existence of the indispensable thing or condition at the time of performance, there arises an implied condition of the contract that, if that thing or condition is destroyed or prevented from coming into existence before the time for the performance of the contract without fault of the obligor, either by the act of God, or by an unavoidable accident, the obligor shall be absolved from liability for his failure to perform. 9 Cyc. 631, 632, 633; Taylor v. Caldwell, 3 Best & Smith, 826, 833, 839; Howell v. Coupland, L. R. 1 Q. B. Div. 258; Baily v. De Crespigny, L. R. 4 Q. B. 180, 185; Dexter v. Norton, 47 N. Y. 62, 64, 65, 7 Am. Rep. 415; Ontario Deciduous Fruit Growers' Ass'n v. Cutting Fruit Packing Co., 134 Cal. 21, 66 Pac. 28, 29, 30, 53 L. R. A. 681, 86 Am. St. Rep. 231; Stewart v. Stone, 127 N. Y. 500, 28 N. E. 595, 596, 14 L. R. A. 215; Wells v. Sutphin, 64 Kan. 873, 68 Pac. 648; Krause v. Bd. of Trustees, 162 Ind. 278, 70 N. E. 264, 267, 65 L. R. A. 111, 102 Am. St. Rep. 203, 1 Ann. Cas. 460. But no decision of the Supreme Court or of any federal court to this effect has been cited or discovered which goes so far, and the rule adopted by the Supreme Court, which must prevail here, is otherwise.

[6] It is that, although general words, which cannot be reasonably supposed to have been used with reference to the possibility of an event, may not be held to bind one, yet, where one, at the time of making his contract, must have known or could have reasonably anticipated, and in his contract could have guarded against, the possible happening of the event causing the impossibility of his performance, and nevertheless he makes an unqualified undertaking to perform, he must do so or pay the damages for his failure.

Thus in Jones v. United States, 96 U. S. 24, 29, 24 L. Ed. 644, a contractor agreed to deliver a certain kind and quantity of cloth to the United States in specified installments at fixed times. After he had delivered some of the installments, the factory which was making the cloth burned without his fault, and this made it impossi· ble for him to deliver the remainder of the cloth at the specified times, although he, at great expense, caused it to be manufactured and ten-

dered it to the government later. The government refused to accept it, because it came too late. The market price of cloth had fallen, and the contractor sued the United States for the damages he sustained, on the ground that he was absolved from performance at the times specified by the act of God, the unforeseen fire. The Supreme Court denied a recovery and said:

"Impossible conditions cannot be performed, and if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an impossibility; but where the contract is to do a thing which is possible in itself, the performance is not excused by the occurrence of an inevitable accident or other contingency, although it was not foreseen by the party, nor was within his control. Chitty, Contr. 663; Jervis v. Tompkinson, 1 H. & N. 208."

In Chicago, Milwaukee, etc., Ry. Co. v. Hoyt, 149 U. S. at page 14, 13 Sup. Ct. at page 784, 37 L. Ed. 625, the Supreme Court states the rule on this subject in this way:

"There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance, and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to, the possibility of the particular contingency which afterwards happens."

In Northern Pacific Ry. Co. v. American Trading Co., 195 U. S. 439, 466, 467, 25 Sup. Ct. 84, 49 L. Ed. 269, the railway company, during the Chinese-Japanese War, made a contract with a shipper to carry from Newark, N. J., to Japan by a specific steamer leaving Tacoma at a certain day, 2,000 tons of lead, which was contraband of war. Time was of the essence of this contract. The company carried the lead to Tacoma and put it in the steamship in time, but the subcollector of the port unlawfully refused to give the ship its clearance on the ground that the lead was contraband, and the master unloaded it, took his clearance, and sailed. The result was that the lead did not reach Japan until six weeks after it would have arrived there, if it had gone on the specified ship. When it arrived, the war had ceased and the price of lead had fallen. The shipper sued for damages, and the defense was that the railway company was absolved from liability by the unforeseen impossibility of performance caused without its fault by the act of the subcollector. The Supreme Court construed the contract to have been an unqualified undertaking to ship the lead by the steamship named, and held the railway company liable for the damages which resulted from the unauthorized and unforeseen act of the subcollector. It said:

"This contract, in view of all the facts, we think was made in contemplation of trouble arising from the character of the lead as contraband of war. * * * Under these circumstances it ought not to be held that the mistaken action of the deputy collector in refusing to give the clearance should operate as an excuse for the nonperformance of the contract, which was not thereby rendered illegal. It cannot be affirmed that such possible refusal was

not within the contemplation of the contracting parties when the contract was made. Many causes, it was known, might operate to obstruct the transportation of articles contraband of war. This particular form of impediment may not have been actually within the minds of the parties to the contract; but there was, as the agreed facts show, present to their minds the fact that there might be trouble in procuring the transportation of the lead because of its character as contraband of war, and in the light of those facts the contract was made, and in substance ratified after it was made. The railroad receivers took the risk of this, as of other obstructions, in making the contract, and they ought to be held to it."

In the light of these principles of law and authorities, the decisive question in this case becomes: Was the contract of these parties an absolute agreement by Erickson to furnish plenty of good grass to the cattle during the grazing season of 1913, or a contract to furnish good grass unless by an unprecedented drought it should become impossible for him to do so? Basic rules for the construction of contracts are: The purpose of every agreement is to record the intention of the parties when their minds met, and the object of all construction is to ascertain and enforce that intention. The court should, so far as possible, put itself in the place of the parties when their minds met upon the terms of the agreement, and then, from a consideration of the writing itself, of its purpose, and of the circumstances which condition its making, endeavor to ascertain what they intended to agree to do, upon what sense and meaning of the terms they used their minds actually met. Accumulator Co. v. Dubuque St. Ry. Co., 12 C. C. A. 37, 41, 42, 64 Fed. 70, 74; Salt Lake City v. Smith, 104 Fed. 457, 462, 43 C. C. A. 637, 643; Fitzgerald v. First National Bank, 52 C. C. A. 276, 284, 114 Fed. 474, 482; American Bonding Co. v. Pueblo Investment Co., 150 Fed. 17, 27, 80 C. C. A. 97, 107, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357. Where, in the application of a contract to its subject-matter, an ambiguity or uncertainty arises, which cannot be removed by an examination of the agreement alone, parol evidence of the circumstances under which it was made, and of statements made in the negotiations which preceded it, may be admitted to resolve the ambiguity and to prove the real intention of the parties. Kilby Mfg. Co. v. Hinchmann-Renton Fire Proofing Co., 132 Fed. 957, 961, 66 C. C. A. 67, 71; Stoops v. Smith, 100 Mass. 63, 66, 67, 1 Am. Rep. 85, 97 Am. Dec. 76; Foster v. Woods, 16 Mass. 116, 117; Sargent v. Adams, 3 Gray (Mass.) 72, 77, 63 Am. Dec. 718; Mumford v. Gething, 7 C. B. (N. S.) 305, 321; First National Bank v. North, 2 S. D. 480, 486, 51 N. W. 96; Herring v. Boston Iron Co., 1 Gray (Mass.) 134, 138; Hinnemann v. Rosenback, 39 N. Y. 98, 101, 102; Proctor v. Hartigan, 139 Mass. 554, 556, 2 N. E. 99; Thorington v. Smith, 8 Wall. 1, 13, 19 L. Ed. 361; Lonergan v. Buford, 148 U. S. 581, 588, 13 Sup. Ct. 684, 37 L. Ed. 569.

Let us apply these rules to the interpretation of this contract. On its face it is free from ambiguity. By it Erickson agrees, without exception or qualification, to furnish plenty of good grass for the cattle during the grazing season of 1913. His counsel argue that his real agreement was that he would furnish plenty of good grass during the season unless an unprecedented drought should make it impossible for him so to do, and that in that case he should be absolved from lia-

bility to perform, and they appeal to the oral testimony to import this exception into the contract. That testimony disclosed these facts: The contract was made on April 16, 1913. Berg was a resident of St. Francis, Tex. He had never had any experience of Kansas grass. He sought pasturing for 1,000 cattle. He went from Texas to Kansas and applied to Erickson for this pasturing. Before the contract was made Erickson showed him the pastures into which he proposed to put the cattle and into which they were subsequently driven. Berg looked at the pastures and made no objection to them. Erickson told him he would guarantee the pastures. After this inspection and conversation Erickson made the contract to furnish plenty of good grass to the cattle during the grazing season of 1913. Droughts are not, and have not been for many years, unusual in parts of Kansas. There had been many before the drought of 1913. It is common knowledge that droughts decrease the production of grass in varying amounts, according to their severity and the character of the land they affect. The drought of 1913 was the most severe ever known in the region where these pastures are. There was no rain from May until September, but it did not prevent the growth of all grass on the pastures. They produced sufficient to keep the cattle alive, and at the end of the season, when they were taken out in November, they weighed as much as, or even more than, when they were placed in the pastures; but the cattle failed to make the gain in flesh and weight which they would have made if Erickson had furnished them plenty of good grass.

In view of these facts, the situation of these parties when this contract was made, the circumstances surrounding them, and the unqualified undertaking of Erickson expressed in the agreement converge with compelling power to force the mind to the conclusion that the minds of these contracting parties met in the intention that Erickson should, and that he did, guarantee plenty of good grass for these cattle in these pastures where he put them during the entire grazing season, without exempting or intending to exempt himself from liability in the case of any impossibility of performance that might result from unprecedented drought, fire, or other act of God or accident. It was common knowledge that droughts were not unusual in Kansas. It was common knowledge that they decreased the growth of grass. It was common knowledge that one could not tell by the examination of pastures in Kansas, of which he had no previous knowledge, in the spring of the year before the 13th of April, whether or not they would produce sufficient grass for 1,000 cattle throughout the coming summer. Berg knew nothing of their productive capacity; Erickson knew all about it. The question whether or not the pastures would produce plenty of grass for 1,000 head of cattle throughout the season, and whether or not the droughts that visited some parts of Kansas would be so severe as to prevent such production, could not have failed to be present in the minds of each of these parties when they made this contract. Those were the crucial questions before them, and the unprecedented drought which prevented the performance of the contract, "the event," in the words of the Supreme Court, "which causes the impossibility, might have been anticipated and guarded against in

the contract." Erickson inserted no provision in the contract exempting himself from liability on the happening of that event, but, on the other hand, promised Berg that he would guarantee the pastures before the written contract was signed, and then made the unqualified undertaking therein to furnish plenty of good grass to the cattle throughout the grazing season. What is more natural or probable than that Erickson, who knew the climate, the pastures, and their productivity, induced Berg, who knew nothing upon this subject and could learn little by an inspection of the pastures in April, to agree to pay the $7 a head for the pasturing of the cattle by making this absolute covenant that he would furnish plenty of good grass to the cattle throughout the season? The proof in this case has satisfied that it was the intention of the parties to this contract that Erickson should thereby make, and that he did make, an absolute covenant with Berg to furnish plenty of good grass for the cattle throughout the entire grazing season without exempting himself from liability in case of drought, fire, or other act of God or accident that might make his performance impossible, that he took the risk of such an event (195 U. S. 467, 25 Sup. Ct. 84, 49 L. Ed. 269), and that he is not absolved from liability for the damages which Berg sustained by reason of Erickson's failure to perform his covenant, although that failure was caused by the unprecedented drought which made his performance impossible.

This conclusion makes it unnecessary to consider or decide the question, discussed in the arguments and the briefs, whether or not, if Erickson was absolved by the act of God from his liability on account of his failure to furnish plenty of grass in July, August, September, and October, he could recover compensation for furnishing it in May and June; for on the next trial he will be credited with the entire contract price of the pasturing, because the measure of Berg's damages is the difference between the value of his cattle as they would have been at the end of the grazing season, if Erickson had furnished plenty of good grass, less the contract price he would have been required to pay, and their value as they actually were at that time. Erickson will also be entitled to an allowance for those expenses he incurred and those services he rendered caring for and feeding the cattle, which his contract to furnish plenty of good grass and his duty to prevent, as far as possible, damages on account of his failure so to do, did not require him to incur or render.

Counsel for Berg argue that this court should find these amounts from the evidence before it and render a judgment for the proper amount in his favor. It is not denied that, as the action at law and the suit in equity were tried together by the court without a jury under a stipulation waiving the latter, this court may have the power as a court of equity so to do. But it is certain that it has the power to direct a new trial of the action at law, and that it ought to do so, because all the evidence upon the amount of Berg's damages appears from the record in hand to have been introduced on his behalf. The court announced its decision that Erickson was absolved from liability for Berg's damages by the drought while Berg was introducing his evidence, and the record fails to show that Erickson presented any

evidence upon the question of the amount of the damages. The reason why he did not do so may have been, and probably was, that he was led to refrain from producing evidence upon that subject because the court had ruled that it was immaterial, and, if so, an assessment of Berg's damages on the evidence before the court at this time might be, and probably would be, inequitable.

The judgment in the action at law and the decree in the suit in equity must therefore be reversed, with costs against Erickson, and the case must be remanded to the court below, with directions to grant a new trial; and it is so ordered.