426 P.2d 798

Ralph KINTNER and Florence Kintner, Roy R. Brockbank and Dorothy M. Brockbank, his wife, Appellants,

v.

Paul WOLFE, Appellee.

No. 8516–PR.

Supreme Court of Arizona.

In Banc.

April 13, 1967.

Rehearing Denied May 16, 1967.

Richard L. Keefe, Tucson, for appellants.

Evans, Kitchel & Jenckes, by Stephen W. Pogson and Jos. S. Jenckes, Jr., Phoenix, for appellee.

McFARLAND, Vice Chief Justice:

This case is before us on a petition for review of the decision of the Court of Appeals, Division 2, reported in 4 Ariz.App. 212, 419 P.2d 116.

On July 9, 1957, plaintiff-appellee, Wolfe, hereinafter referred to as lessor, leased a liquor license to Kintner, hereinafter referred to as lessee. The rent was guaranteed by defendant-appellant Brockbank, hereinafter referred to as guarantor. The lease and guaranty were one written agreement. Lessee defaulted in his payments, and lessor sued him and the guarantor. The case was tried without a jury, upon an agreed statement of facts.

Guarantor appealed from a judgment for $30,000 rendered against him. The court of appeals reduced the amount to $8,500.

At the time the agreement was signed, the guarantor owned a building in Sierra Vista, Arizona, and the lessor owned a liquor license. Upon the execution of the agreement, the license was registered for use in guarantor's building, and Kintner became the lessee of both the building and the liquor license, and the operator of El Coronado Cocktail Lounge. Lessee's use of the license continued until April 1963 at which time he went into bankruptcy. No rent was paid on the liquor license after July 31, 1962. The negotiations leading up to the execution of the agreement were carried on between lessor and guarantor. Prior to the agreement, the liquor license was in use by the lessor at a bar in Sierra Vista known as "Mac's Bent Elbow."

The agreement between the parties is entitled "LEASE AGREEMENT AND GUARANTY," and although it is a single document, after reciting the date and naming the parties, it is divided into two parts. The first is entitled "LEASE AGREEMENT," and is signed by lessor and lessee; the second is entitled "GUARANTY," and is signed by the lessor and guarantor.

The lease agreement provided that:

The lease would run from August 1, 1957, to July 31, 1962, with an option in the tenant to renew for an additional five years.

The rent would be $500 per month.

Default in the payment of rent, continued for fifteen days, would give the lessor the option "to declare the whole of the rent herein contracted for, due and payable, whether under original or renewed term."

The guaranty provided that:

In the event lessee defaulted in payment of rent, guarantor might pay the rent on behalf of the lessee.

If lessee's right to operate under the license terminated for any reason prior to the end of ten years from the commencement of the lease, lessor would lease the license to the guarantor or his designee for the remainder of the ten-year term.

No rental payment would be excused for any period during which operations were not conducted by virtue of the leased license.

Guarantor guaranteed "the payment to lessor, of rent totalling $60,000 . . . over a period of ten years from the date the initial term of said lease commences, without respect to future changes in conditions obtaining now or at any given time, and subject further to lessor's right to accelerate payments for non-compliance as in said lease agreement provided, and for all or any portion of the full amount herewith contracted to be paid lessor within ten years from said date of commencement".

Guarantor would agree to the retransfer of the license to lessor in the event guarantor failed to provide another suitable lessee.

Lessor's complaint was filed October 4, 1962, and in it he declared "the whole of the rent contracted for, due and payable."

The rent for the first five-year term was paid in full. The option to renew for a second five-year term was never exercised. The $30,000 judgment represented the full rent for the full second five-year term.

In 1961 the Arizona legislature made the leasing of liquor licenses illegal, except for existing commitments which were permitted to continue until December 31, 1963.

Two questions stand out clearly as determinative of this decision:

1. Was guarantor's obligation limited to paying such sums as lessee was obligated to pay? and

2. If not, was his obligation terminated by the passage of A.R.S. § 4–203?

■ The general rule is that the interpretation of a contract is a question for the court. Chandler Improvement Co. v. Andersen, 39 Ariz. 426, 7 P.2d 255.

Williston on Contracts states the rule governing the interpretation of contracts as follows:

"The cardinal rule of construction to be applied in the interpretation of contracts is to ascertain the intention of the parties. One of the principal phases of such consideration is to arrive at the meaning the parties themselves attached to the words and phrases used in the contract to express their intention. * * * 'Words generally bear their usual and common signification' * * *. The writing will be read as a whole, and every part will be interpreted with reference to the whole; * * * The circumstances under which a writing was made may always be shown. * * * all the surrounding circumstances at that time necessarily throw light upon the meaning of the contract." Williston on Contracts, 3rd Ed., Vol. 4, Sect. 618.

When the various rules of interpretation fail to clarify the intention of the parties, an interpretation should be adopted "which gives effect to the main purpose of the agreement." Ibid, p. 733.

From the fact that guarantor owned a building but no liquor license, and the fact that he dealt directly with lessor in negotiating the use of the liquor license for Kintner, who became guarantor's tenant, we may infer that the main object of guarantor's signing the agreement was to get a profitable business going in his building. Practical people, with no ties of blood or affection do not guarantee rent for total strangers unless there is some possibility of pecuniary benefit. Likewise, from the fact that lessor's liquor license was registered in the name of a bar called Mac's Bent Elbow, we may infer that his main object was to get an assured income from a license which would command a good rental, while the profits from the operation of Mac's Bent Elbow might have been subject to large fluctuations, and might have required hard work and long hours on the part of the operator.

■ The following legal principles must be applied in determining the intent of the parties in making the agreement:

"The nature of an instrument is determined by the effect the law gives to its terms and not by the title by which the parties have designated the instrument." Woolsey v. Lassen, 91 Ariz. 229, 238, 371 P.2d 587, 592; Employer's Liability Assurance Corporation Ltd. v. Lunt, 82 Ariz. 320, 326, 313 P.2d 393.

"This is more than a guaranty; it is an independent agreement to become the principal debtor under the circumstances set forth in the assignment. The mere fact that the assignment is denominated at the top 'Assignment with Guaranty of Payment' or that the word 'guaranty' is used therein does not of itself make it, as a matter of law, a simple contract of guaranty. The character of a legal instrument is determined by what is within the four corners thereof, and not by the name given to it." Pacific Finance Corp. of California v. Burkhart, 56 Ariz. 383, 391, 108 P.2d 380, 383.

"Nor is the fact that a promise is called by the parties a guaranty, conclusive evidence that the promise is not original." Williston on Contracts, 3rd Ed., Vol. 3, sect. 465.

The instant case is similar to Dykes v. Clem Lumber Co., 58 Ariz. 176, 118 P.2d 454, in which we said:

"We think the written agreement on which the suit was based was not a guaranty of an obligation of defendant to the bank, but was an original and primary obligation of plaintiff to it." p. 181, 118 P.2d p. 456.

In view of the above facts and legal principles it is clear that the agreement between the parties was an unconditional promise by guarantor to pay $500 per month to lessor for ten years, *"without respect to future changes in conditions."*

Having construed the contract to be a primary obligation of the guarantor, we pass to the construction of the phrase "without respect to future changes in conditions."

"In interpreting a written contract the court should, as far as possible, place itself in the position of the parties at the time of its execution, and then, from a consideration of the instrument itself, its purposes, and the circumstances surrounding its execution, ascertain the intention of the parties." 4 Williston on Contracts, sect. 618.

For years before the enactment of A.R.S. § 4–203, it was common knowledge that many people were of the opinion that the leasing of liquor licenses ought to be abolished. Lessor argues that it was this very possibility that caused the insertion of the "changes-in-conditions" clause in the guaranty. We have no way of knowing what was in the minds of the parties at the time, and cannot ascertain whether knowledge of the impending change in the statute was common in Sierra Vista in 1957. The parties have offered no evidence to clarify this question. Guarantor contends that the clause was inserted to cover the possibility of deteriorating economic conditions, such as a recession, or the closing down of nearby Fort Huachuca. But such changes would not excuse performance, and their possibility did not require such a clause to protect lessor. Westesen v. Olathe State Bank, 75 Colo. 340, 225 P. 837.

This clause is the key to the interpretation of the contract. It cannot be ignored. "An interpretation which gives * * * meaning to all manifestations of intention is preferred to an interpretation which leaves part of such manifestations * * * of no effect." Restatement, Contracts § 236a; Tyson v. Tyson, 61 Ariz. 329, 149 P.2d 674. We must, therefore, give effect to this clause in our interpretation, and if it is used, it can have but one meaning, and that is that the guarantor intended to see that the lessor got the full $60,000 over the ten-year period. *Any other interpretation of the clause would be to give it no meaning at all.* We are aware of the appealing force of guarantor's arguments, but we are convinced that whether or not the change in the law was foreseen, the intention of the parties was that the guarantor should remain liable for the full $60,000, regardless of whether lessee exercised his option and regardless of whether the laws were changed.

We pass now to the second question— whether A.R.S. § 4–203 terminated guarantor's liability under the contract. The statute was enacted in 1961. It made the leasing of liquor licenses illegal, except for existing leases, which were permitted to continue to December 31, 1963. Based upon that statute, guarantor argues that the lease contract became both illegal and impossible to perform, and that under either doctrine he was excused from making further payments to lessor.

The difficulty with this argument is that while lessor's continued leasing became illegal and impossible, the payment of the promised monthly stipend was still legal and possible. If the guarantor had any defense at all because of the passage of the statute, such defense would have to be based upon the doctrine of failure of consideration, or the similar doctrine of commercial frustration. The reasoning behind these legal concepts is that since the $60,000 was promised for the use of a

liquor license for ten years, the failure of the lessor to make his license available, because prohibited by law from so doing, made it unnecessary for guarantor to continue the payments.

But we have already indicated that we construe the contract to obligate the guarantor regardless of changes in conditions. Such a contract is perfectly legal.

█ A party has a right to contract to make payments regardless of future conditions.

"If the parties to a contract have agreed in express or implied terms that the risk of loss shall fall upon one or the other of the parties, full effect is given to such provision." 5 Page on Contracts, 2nd Ed., 4783

"An intention of the parties to the effect that performance by one of them shall not be affected by supervening impossibility, has been inferred by the courts from the fact that under the contract, interpreted as a whole, the party who has performed has agreed that his performance shall be absolute, unconditional, or irrevocable." 144 A.L.R. 1319

In our opinion the instant case may be likened to the case of Berg v. Erickson, 234 F. 817, 825 (8th Cir.), in which the court held:

"Erickson * * * promised Berg that he would guarantee * * * to furnish plenty of good grass to the cattle throughout the grazing season. * * * It was the intention of the parties to this contract that Erickson should thereby make, and that he did make, an absolute covenant with Berg * * * without exempting himself from liability * * * although that failure was caused by the unprecedented drought which made his performance impossible."

It will be observed that in the Berg case, the defendant did not promise to furnish plenty of grass "without respect to future change in conditions," so that the instant case against the guarantor is much stronger.

In Ellwood v. Nutex Oil Co. (Tex.Civ. App.), 148 S.W.2d 862, the court stated:

"* * * [T]here is nothing illegal in the contract, and the obligation is unconditional and absolute. The Company must be held to have assumed the risk of its inability to produce a buyer * * *. We think this case falls within the general rules applicable to contracts, that one who unconditionally obligates himself to do a thing possible of performance, must be held to perform it * * *."

In Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, a ship charter and bill of lading provided "Freight to be prepaid net on signing bills of lading" and "Freight earned, retained, and irrevocable, vessel lost or not lost." After loading and payment of freight, war and government regulations made it impossible to sail, and plaintiff sued for a return of his money. He argued that freight was a charge for the carrying and delivery of the cargo, and that the stipulation that the freight was earned and irrevocable did not lessen the obligation to carry and deliver the cargo. The Supreme Court of the United States held that the contract provided for this contingency, and that the provision with regard to freight being irrevocable was not idle or accidental. The following cases are to the same effect: International Paper Co. v. The Schooner Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318; Standard Varnish Works v. Steamship Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321.

█ One other matter needs to be noted. We have previously stated that the defense, if any, must be failure of consideration, on the theory that the guarantor agreed to pay $60,000 for ten years' use of a scarce and hard-to-get liquor license, so that he would have a paying tenant in his building. For consideration to have failed as to him, he would have to have been deprived of the use of a license so that he was prevented from having a licensed tenant after the new liquor law.

The new law was enacted in 1961. Although it outlawed leasing of liquor licenses, it also provided that lessees who lost their leases of liquor licenses because of the new law could apply for and receive new licenses to replace those lost. In other words, this lessee was provided with an opportunity to get a new license so that he could continue to operate his cocktail lounge in guarantor's building. *His right to such a new license came directly from the outlawed lease under which he had been operating.* Obviously, therefore, there was no failure of consideration as to lessee or guarantor. As a matter of fact, the record shows that lessee applied for a new license, but did not remain in business long enough to receive it. There is no evidence that the vacation of the premises by lessee was due to a lack of a license; in fact, the record indicates that lessee paid for a renewal license for 1963, and continued operating the bar until he went into bankruptcy in that year.

The judgment of the Court of Appeals is vacated, and the judgment of the trial court is affirmed.

BERNSTEIN, C. J., and STRUCK-MEYER, and LOCKWOOD, JJ., concur.

UDALL, Justice (dissenting):

I respectfully disagree with the majority in the interpretation given to that part of the contract designated:

"(2) GUARANTORS agree:

"A. To guarantee the payment to LESSOR of rent totalling Sixty Thousand Dollars ($60,000.00), or Five Per Cent (5%) of the gross proceeds of the sale, whichever is greater, at the rate and in the manner provided for in said Lease Agreement, over a period of ten (10) years from the date the initial term of said lease commences, *without respect to future changes in conditions obtaining now or at any given time,* * * *." (emphasis added)

A.R.S. § 4–203, subsec. E reads:

"E. No spirituous liquor license shall be assigned, transferred or sold, except as provided for in this title. No spirituous liquor license shall be leased or subleased, except that for the purpose of preserving rights and duties that have already matured, any licensee who has leased a spirituous liquor license under a lease in effect on the effective date of this subsection shall, after examination of such lease by the superintendent, be permitted to continue the lease according to its terms, and the license shall revert to the lessor upon expiration of the lease, or upon any termination of the lease, or by December 31, 1963, whichever is sooner."

It is my opinion that in 1961, when the Arizona State Legislature adopted the above, it effected a change in the law that made it illegal for the liquor license in the case at bar to be transferred to the guarantor, or such person or persons as might be designated by him, and therefore it was impossible for the guarantor to comply with the contract.

The guarantor contends that the clause in the contract, "without respect to future changes in conditions obtaining now or at any given time", was inserted to cover the probabilities of deterioration or change in economic conditions which might frustrate the use of the license in question by the lessee, such as the abandonment of Ft. Huachuca as a military installation, or other occurrences of a like kind, but that it did not include a change in the law by the legislature that would make illegal the performance of the contract in question. I agree with this contention.

The majority has cited the cases of Ellwood v. Nutex Oil Co. (Tex.Civ.App.) 148 S.W.2d 862; Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312; International Paper Co. v. The Schooner Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318; Standard Varnish Works v. Steamship Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321;

and Berg v. Erickson, 234 F. 817 (8th Cir.), to the general effect that:

"An intention of the parties to the effect that performance by one of them shall not be affected by supervening impossibility, has been inferred by the courts from the fact that under the contract, interpreted as a whole, the party who has performed has agreed that his performance shall be absolute, unconditional, or irrevocable." 144 A.L.R. 1319

In none of these cases is there even an intimation that compliance could not be carried forward because of a change in the law. All of the cases above referred to concern "future changes in conditions" affecting the contracts but none of them pertain to a "change in the law" that prevents the performance of the contract. Furthermore, all of these cases are clearly distinguishable from the instant case on their facts. For example, that Allanwilde, International Paper and Standard Varnish are decisions dealing with maritime shipping and prepaid freight fees.

I am of the persuasion that the principles of law applicable to the interpretation of the subject contract under the facts in this case are those discussed in the following cases: In Burkus v. Henshall, 386 Pa. 478, 126 A.2d 722, 724, the court quoted with approval from Restatement, Contracts, § 458:

"'A contractual duty * * * is discharged, in the absence of circumstances showing * * * a contrary intention * * *, where performance is subsequently prevented or prohibited (a) by * * * a statute of * * * any one of the United States whose law determines the validity and effect of the contract * * *.'"

\* \* \* \* \* \*

"'There is appended to all contracts an implied condition that after the making of the agreement, no law or governmental regulation will be enacted rendering continued performance of the contract unlawful. Therefore, where without fault of the party his continued performance of a contract is rendered illegal by a subsequent governmental regulation, his duty of rendering performance is discharged.'" (Sum.Pa.Jur., Contracts, § 465).

The case of Jefferson Estates v. Wilson, Mun.Ct., 35 N.Y.S.2d 582, 584, contains the following language:

"The general rule that where a party, by his own contract creates a duty or charge upon himself, that he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, does not apply where performance becomes impossible by a change in the law or by reason of action taken under governmental authority. To hold them bound to anticipate future legislation would be equivalent to making them obligate themselves to performance of conditions prescribed by others, which in the nature of things could not have been within the contemplation of the parties at the time the contract was made."

The Ohio court in Massillon Savings & Loan Co. v. Imperial Finance Co., 114 Ohio St. 523, 151 N.E. 645, stated the rule to be that where a contract is legal when made, and subsequently such contract or its performance is prohibited by statute, performance thereof after the time when such prohibitive law becomes effective is illegal and neither party can recover for breach of the contract. The opinion quotes from 3 Williston on Contracts, § 1759:

"Where the contract was originally legal, but because of a change * * * in the law, performance of the acts contracted for on one side or the other has become illegal, any subsequent performance of such acts is against public policy and the party who has undertaken to perform them is excused from so doing."

In the California case of Industrial Development & Land Co. v. Goldschmidt, 56

Cal.App. 507, 206 P. 134, 135, it was held that:

"* * * (A) contract which contemplates the doing of a thing, at first lawful, but which afterwards and during the running of the contract term becomes unlawful, is affected in the same way, and ceases to be operative upon the taking effect of a prohibitory law."

See also the cases of Takahashi v. Pepper Tank & Contracting Co., 58 Wyo. 330, 131 P.2d 339; Colonial Operating Corp. v. Hannon Sales & Service, Inc., 178 Misc. 879, 34 N.Y.S.2d 116; and Adler v. Miles, 69 Misc. 601, 126 N.Y.S. 135.

Hence, what I believe to be the applicable law is stated as follows in 6 Williston on Contracts, § 1938:

"It would obviously be a gross injustice if the law should hold a promisor liable for failing to perform the promised act after the law itself had prohibited its performance, though at the time of the contract the undertaking was legal; and it may be said broadly that where the law forbids or prevents the performance of a promise, legal when made, the promisor is freed from liability."

I also disagree with the statement of the majority that the consideration for the subject contract had not failed even though the statute of 1961 had been enacted. The majority opinion states

"Although it [referring to the enactment of 1961] outlawed leasing of liquor licenses, it also provided that lessees who lost their leases of liquor licenses because of the new law could apply for and receive new licenses to replace those lost. In other words, this lessee was provided with an opportunity to get a new license so that he could continue to operate his cocktail lounge in Guarantor's building. *His right to such new license came directly from the outlawed lease under which he had been operating.* Obviously, therefore, there was no failure of consideration as to lessee or guarantor."

The lessor agrees in section C of the guaranty agreement:

"That in the event the Lessee's right to operate under said license is terminated for any reasons prior to the expiration of ten (10) years from the date of commencement of said lease term, then and in such case, Lessor will lease said license to Guarantors or the person or persons designated from the remainder of said ten (10) year period upon the following terms and conditions:

"(1) Any such further and additional lease shall be subject, in all cases, to the final approval of the State Department of Liquor Licenses * * *."

In Hooper v. Duncan, 95 Ariz. 305, 308, 389 P.2d 706, 708, this Court said:

"* * * as between the licensee and the state, a liquor license is merely a privilege subject to the police power of the state; it is not a 'property right' or a 'contract' in the legal or constitutional sense of those terms."

\* \* \* \* \* \*

"'A license for the sale of liquor is in effect a mere permit, affording protection to the holder against legal animadversion for acts which, without its sanction, would be illegal and punishable.'"

We noted in Black v. Siler, 96 Ariz. 102, 105, 392 P.2d 572, 574:

"'State control of liquor licenses under the police power ranges from complete prohibition to lesser degrees of regulation and surveillance. (citation) It is the province of the Legislature to determine to what extent such regulation shall be exercised. The prohibition of the leasing of liquor licenses commence within such state control.'"

I am convinced that under these decisions the guarantor had no absolute rights under the subject contract, and when the lessor agreed to lease said license to guarantor, or the person or persons designated by him, for the remainder of the ten-year period, the agreement was void since the lessor had

no such right to lease the license to the guarantor. A.R.S. § 4–203, subsec. E, adopted in 1961, provides in pertinent part:

"E. * * * No spirituous liquor license shall be leased or subleased, except that for the purpose of preserving rights and duties that have already matured, any licensee who has leased a spirituous liquor license under a lease in effect on the effective date of this subsection shall, after examination of such lease by the superintendent, be permitted to continue the lease according to its terms * * *."

I think it is clear that the rights of the guarantor in the lease had not already matured nor had a lease been put into effect in favor of the guarantor as of the effective date of the statute in 1961. Therefore, contrary to the opinion of the majority, there was a failure of consideration as to the guarantor.

For the above reasons, I would affirm the opinion of the Court of Appeals that the judgment of the lower court should be reduced from the sum of $30,000 to the sum of $8,500, which sum represents the rent due from August 1962 through December of 1963.