ARABIAN SCORE, a Minnesota limited partnership, Appellant,

v.

LASMA ARABIAN LTD., a Florida limited partnership and Lasma Corporation, an Arizona corporation, Appellees.

No. 86–5113.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1986.

Decided March 24, 1987.

Larry M. Wertheim, Minneapolis, Minn., for appellant.

Randolph J. Haines, Phoenix, Ariz., for appellees.

Before HEANEY and WOLLMAN, Circuit Judges, and DUMBAULD,* Senior District Judge.

WOLLMAN, Circuit Judge.

Beating dead horses is the sport of appellate judges, a generally harmless pastime painful only to the readers of appellate opinions. Paying for the promotion of dead horses can be an expensive proposition, however, as the facts of this case make abundantly clear.

Arabian Score (Arabian), a Minnesota limited partnership, appeals from the district court's [1] orders granting summary judgment in favor of Lasma Arabian Ltd. (Limited), a Florida limited partnership, and Lasma Corporation (Lasma), an Arizona corporation. We affirm.

On October 27, 1983, Arabian entered into an agreement to purchase from Limited an Arabian colt named Score. The agreement, which the parties agreed would be governed by and construed in accordance with the laws of Arizona, provided that Arabian would pay Limited $1 million "for the purchase of Score and the performance by Lasma of various services in the promotion of Score." The contract required Lasma to spend $250,000 for the performance of those services, which consisted of advertising and promoting Score as a 2 Star Stallion under a license agreement with Lasma Star Stallion, Inc., a separate corporation that is not a party to this lawsuit.

Paragraph 4 of the agreement provided that for a period of five years after the date of his purchase, Score would be a 2 Star Stallion, as defined by the Star Stallion license agreement, with the result that Score's foals would be eligible for nomination to all Lasma-sponsored sales open to the get of Lasma stallions.[2] If Lasma Star Stallion, Inc., in its sole discretion, determined that Score was not eligible to participate in the Star Stallion Program, Lasma would, at Arabian's option, replace Score with an eligible stallion or refund to Arabian the unused portion of the money Lasma would otherwise be required to spend promoting Score pursuant to the terms of paragraph 5 of the agreement.

Paragraph 5 of the agreement provided that for five consecutive calendar years commencing with 1984, Lasma would implement a complete annual program for the promotion of Score as a 2 Star Stallion. Lasma was to pay $70,000 for the 1984 program and $45,000 for each of the remaining four annual programs. The annual programs were to "include advertising in various trade publications, direct mail programs and the training, boarding, conditioning and showing of SCORE by Lasma."

Pursuant to paragraph 6 of the agreement, Lasma guaranteed that Score was not infertile.

Paragraph 9 of the agreement provided: "Except as provided by paragraphs 4 and 6 above, the Partnership accepts SCORE *AS IS*, all implied warranties being excluded. Risk of loss passes upon closing. All incidental and consequential damages are excluded."

On February 8, 1984, Arabian obtained a mortality insurance policy from Transit Casualty Company insuring Score for his actual cash value. Alas—*memento mori*—Score went to his reward within the year, dying on September 11, 1984, having sired two foals during his brief life. Misfortune compounding, Transit Casualty Company (its name bespeaks its character?) went broke. Lasma having expending only $52,-891.14 for the promotion of Score, Arabian brought suit against Lasma and Limited, seeking recovery of the $197,108.86 not expended from the $250,000 that the pur-

---

* The HONORABLE EDWARD DUMBAULD, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

2. As near as we can tell from the materials presented to the trial court, the Star Stallion Program is to the ranking of Arabian horses what the Mobil Guide is to the ranking of restaurants. This may not be a totally accurate description, but it will do for the purposes of this case.

chase agreement allocated for the promotion of Score.

Count I of Arabian's complaint (later dismissed by stipulation) alleged that Lasma and Limited had breached the contract by not promoting Score. Count II sought recovery of the unspent portion of the $250,-000 on the ground of impossibility of performance. Count III sought recovery under paragraph 4 of the purchase agreement.

The district court ruled that because Score's death was a foreseeable risk that was assumed by Arabian by the terms of the purchase agreement, neither the doctrine of impossibility nor of commercial frustration was applicable. Likewise, because the unrebutted evidence established that it is not unusual for Lasma Star Stallions, Inc. and Lasma to promote deceased horses, it was not an arbitrary, capricious, or irrational exercise of discretion by Lasma to determine that Score was still eligible postmortem to participate in the Star Stallion Program.

As provided by the agreement, we look to Arizona law to resolve the issues presented by Arabian's complaint.

In *Garner v. Ellingson,* 18 Ariz.App. 181, 501 P.2d 22 (1972), the Arizona Court of Appeals defined commercial frustration as circumstances beyond the control of the parties which render performance of the contract impossible and exonerate the party failing to perform. The court did not limit the doctrine to strict impossibility but included impracticability caused by extreme or unreasonable difficulty or expense. *Id.* 501 P.2d at 23. The court did require, however, proof that the supervening frustrating event was not reasonably foreseeable. *Id.* at 24.

In *Mohave County v. Mohave-Kingman Estates,* 120 Ariz. 417, 586 P.2d 978, 983 (1978), the Arizona Supreme Court stated that "while Arizona recognizes the doctrine of commercial frustration * * * we do not see fit to interpret it as a general absolution whenever performance under the contract becomes difficult or expensive. Proper application of this doctrine requires us to examine whether the allegedly frustrat-

ing event was reasonably foreseeable." In that case, the court refused to apply the doctrine where a zoning change had affected the economic feasibility of a contract to buy and develop land. The court reasoned that "the doctrine of commercial frustration does not apply to the instant case because the risk of change in the zoning ordinances was an event properly foreseeable by the defendants, and one which they would have contracted against." *Id.* 586 P.2d at 984.

Arizona rejects the application of the commercial frustration doctrine when a party assumes the risk of the frustrating event. *Kintner v. Wolfe,* 102 Ariz. 164, 426 P.2d 798 (1967). In *Kintner,* the Arizona Supreme Court rejected a commercial frustration claim by a guarantor who had agreed to remain liable for the rent due on a liquor license lease "without respect to future changes in conditions." A change in law made renting liquor licenses illegal, but the court required the guarantor to pay, stating: "If the parties to a contract have agreed in express or implied terms that the risk of loss shall fall upon one or the other of the parties, full effect is given to such provision." *Id.* 426 P.2d at 803.

We conclude that the trial court was correct in holding that the commercial frustration doctrine is inapplicable in this case, both because Score's death was foreseeable, as evidenced by Arabian's purchase of insurance, and because Arabian assumed the risk that Score might die prematurely. Moreover, the doctrine of impossibility/commerical frustration is not applicable because the party obligated to perform—Lasma—does not contend that it is unable or unwilling to complete its duty to promote Score.

Arabian further contends that by virtue of his death Score is no longer eligible to participate in the Star Stallion Program; consequently, paragraph 4 of the agreement obligates Lasma to return any unspent portion of the funds earmarked for promotional purposes.

As indicated earlier, Lasma Star Stallion, Inc. is not a party to this lawsuit, and there are no findings by the district court that

Lasma or Limited controls Lasma Star Stallion, Inc. in the exercise of its discretion. Because Lasma Star Stallion, Inc. has not declared Score to be ineligible for the Star Stallion Program, the condition precedent to Lasma's obligation under pargraph 4 of the agreement has not been satisfied.

Even if it were within Lasma's discretion to declare Score ineligible to participate in the Star Stallion Program, we could not say that the decision that Score is still eligible for the program was an arbitrary or capricious abuse of discretion.

Arabian argues that the decision to promote a dead horse is per se arbitrary.[3] As indicated above, however, Lasma's unrebutted evidence shows that Lasma Star Stallion, Inc. and Lasma regularly promote deceased horses. This is done to enhance the owning entity's reputation and to increase the value of the stallion's progeny. Further, the language of paragraph 4 was not intended to cover the risk of death but of ineligibility for other reasons, such as infertility or substandard offspring.

It is with some reluctance that we affirm the district court's grant of summary judgment. That reluctance stems from the thought that spending $197,108.86 to promote a dead horse borders on the bizarre. The parties to this agreement were sophisticated and, we assume, well-heeled businesspersons, however, and that which we find to be somewhat unusual may be commonplace to those who inhabit the wealthy world of the horsey set.

The judgment dismissing Arabian's complaint is affirmed.

---

**3.** At oral argument, counsel for Arabian asked, rhetorically we assume, "How are you going to show a dead horse?" Considerations of judicial decorum and a due regard for the financial loss suffered by Arabian dissuaded us from suggesting the construction of a mausoleum—an equestrian Lenin's Tomb, if you will.